**MAINE CENTRAL RAILROAD COMPANY**

v.

**Raymond L. HALPERIN et al.**

Supreme Judicial Court of Maine.

Nov. 16, 1977.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster, by William C. Smith, James G. Good, Portland, for plaintiff.

Clifford B. Olson, Bureau of Taxation, Jerome S. Matus, Asst. Attys. Gen., Augusta, for defendants.

Henri Francis Rush, Alan W. Heifetz, Interstate Commerce Commission, Washington, D. C., for amicus curiae.

Before DUFRESNE, C. J., and WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

WERNICK, Justice.

On July 23, 1975 plaintiff Maine Central Railroad Company commenced a civil action in the Superior Court (Kennebec County) seeking an adjudication by declaratory judgment (14 M.R.S.A. §§ 5951–5963) that either (1) 36 M.R.S.A. § 2624, correctly interpreted, does not contemplate, for the purpose of the computation of Maine's excise tax on railroads, the inclusion within "net railway operating income" of "incentive per diem" charges (49 C.F.R. Part 1036, as hereinafter more fully explained); or (2) if the statute requires such inclusion, in that particular it violates the Constitution of the United States, contravening the "Supremacy" Clause of Article VI, or the "Commerce" Clause of Section 8 of Article I, or both.

Named as defendants in the action were the State Tax Assessor, Raymond L. Halperin, and the Attorney General, Joseph E. Brennan. The Interstate Commerce Commission was permitted to intervene in the action as amicus curiae. Issue was joined by an answer filed by defendants. Defendant State Tax Assessor also filed a counterclaim demanding judgment against plaintiff for balances of excise tax payments due for three quarters in 1975, in the amounts of $205,252.93, $228,794.33 and $228,794.33 as ascertained due on June 15, September 15 and December 15, respectively, "plus interest of 10% from the due dates of the respective payments." These amounts were the total additional assessment attributable to the failure of Maine Central to include "incentive per diem" charges in its "net railway operating income" in the computation of the railroad excise tax for the year 1974.

Pursuant to Rule 72(b) M.R.Civ.P., the case has been reported to us on an agreed statement of facts for our determination of the rights of the parties.

*I. The Maine Excise Tax on Railroads*

Since 1881 the State of Maine has imposed upon every corporation operating a railroad in the State

"an annual excise tax for the privilege of exercising its franchises and the franchises of its leased roads in the State." (Currently, 36 M.R.S.A. § 2623)

Presently, this annual excise tax together with the tax provided for in 36 M.R.S.A. § 561 are "in place of all taxes upon the property of such railroad." (36 M.R.S.A. § 2623)[1] The amount of the tax is equal to a percentage of the gross transportation receipts. The applicable percentage rate increases with increase in the proportion of net railway operating income to gross

1. Section 561—which together with § 2623 operates in lieu of all property taxes—provides: "The buildings of every railroad corporation or association, whether within or without the located right-of-way, its lands and fixtures outside of its located right-of-way, and so much of its located right-of-way over which all railroad service has been abandoned, are subject to taxation in the places in which the same are situated, as other property is taxed therein, and shall be regarded as nonresident land." Thus, § 2623 operates as a tax upon the railroad franchise treated as property, in lieu of property tax on railroad right-of-way land and fixtures.

transportation receipts. "Net railway operating income" is statutorily defined as

> "railway operating revenues less the railway operating expenses, . . . including in the computation thereof debits and credits arising from equipment rents . . . ." (36 M.R.S.A. § 2624)

## II. Incentive Per Diem Charges

"Incentive per diem" charges went into effect in 1970 as part of the federal government's continuing efforts to remedy a chronic shortage of railroad freight cars. The history leading to this resort to incentive per diem charges will assist understanding of the relationship between them and the Maine excise tax on railroads.

The practice of interchanging railroad freight cars instead of transferring loads at the end of each railroad's line became a requirement of law with the enactment of the Interstate Commerce Act in 1887. The result was that the freight cars of the nation "became in essence a single common pool, used by all roads", *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 743, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972), and each railroad boxcar owner was paid rent for the use of its cars by another railroad.

Because a critical boxcar shortage developed during World War I, Congress enacted the "Esch Car Service Act" of 1917, 40 Stat. 101, 49 U.S.C. § 1(14)(a). It empowered the Interstate Commerce Commission to establish per diem rental charges as *compensatory* charges; they presently consist of mileage and per diem rates varying with the cost and age of the boxcar. As regular rental charges, these per diem rates provide revenue which the collecting railroad may utilize for its expenses and general corporate purposes.

In 1966, confronting a persisting nationwide boxcar shortage, Congress amended the Interstate Commerce Act to authorize the Commission to prescribe additional charges embodying such *incentive* element as will

> ". . . in the judgment of the Commission, provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense." [2]

By comprehensive regulations [3] the Commission thereafter established "incentive per diem" charges: charges over and above the basic compensatory rental charges applicable to general service unequipped boxcars in the possession of non-owning railroads. As revenues received for car hire in excess of the costs or risks of ownership, the incentive per diem charges are intended to encourage railroads to acquire and maintain an adequate supply of freight cars.

Further to assist in this purpose, the regulations specifically restrict a railroad's use of incentive per diem income to the purchasing, building, rebuilding, or leasing of boxcars and to the payment of state and federal *income* taxes attributable to incentive per diem income. With the funds derived from incentive per diem charges thus earmarked and segregated, they are not available as general corporate funds from which the railroad can pay its liabilities, such as Maine's excise tax on railroads.[4]

---

**2.** Section 1(14)(a), as amended by P.L. 89–430, 80 Stat. 168 (1966) and re-enacted by P.L. 94–210, 90 Stat. 46–47 (1976).

**3.** The regulations, originally set forth in Incentive Per Diem Charges—1968, Ex Parte No. 252 (Sub. No. 1), 337 I.C.C. 183 (1969), now codified at 49 C.F.R. Part 1036, have been sustained by the Courts, *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), on remand, 368 F.Supp. 1009 (M.D.Fla.1973), aff'd per curiam, 417 U.S. 901 (1974), and thus are deemed to have the force of law. *Public Utilities Commission of California v. United States,* 355 U.S. 534, 542, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958).

**4.** In addition, each carrier must acquire its "test period quota" of boxcars each year with general corporate funds before expending any incentive per diem funds. The quota, designed to prevent use of incentive funds for the ordinary purchase of car replacements, requires the railroad to purchase its annual average number of cars purchased, built or rebuilt in the five-year period from 1964 to 1968.

After expenditure by a railroad of the incentive per diem funds, the boxcars so acquired become part of the railroad's general assets:—that is, earmarking of the incentive per diem funds restricts the railroad only up to and including the point of expenditure; thereafter the railroad owns the boxcars outright, even though the financial source represents revenue in excess of the ordinary rate of return.

The incentive per diem charge funds collected by the railroad must either be put to the intended use within eighteen months or be voluntarily surrendered to "Rail Box", a corporation approved by the Interstate Commerce Commission and organized to acquire, own and lease a fleet of boxcars for use as a national boxcar pool. If a railroad which has not made timely use of the incentive funds fails to surrender them to Rail Box, the railroad becomes subject to investigation by the Interstate Commerce Commission.

### III. Inclusion of Incentive Per Diem Charges in Net Railway Operating Income

■ As a threshold issue, we are asked to decide whether the concept of "net railway operating income", as statutorily defined, requires the inclusion of incentive per diem charges in the computation of the Maine excise tax on railroads.

Maine Central contends that such inclusion of incentive per diem charges would be contrary to the Legislature's purpose in adopting the current definition of net railway operating income. As support for this position, Maine Central relies on the Legislature's adoption of the gross-net method of taxation in 1927, which, says Maine Central, reflects legislative intent that the excise tax be based strictly on the railroad's ability-to-pay. Maine Central argues that because the earmarking of the incentive per diem funds precludes use of the funds for general corporate purposes, such as payment of the railroad excise tax, inclusion of the restricted incentive per diem funds in the tax computation would increase the tax burden on general corporate assets and

therefore is not consonant with the legislative approach predicated on ability-to-pay.

The argument is unconvincing.

As the excise tax on railroads was originally enacted in 1881 (P.L.1881, Ch. 91), the rate of the excise tax increased with increase in the average gross transportation receipts per mile of track, and the amount of the tax was determined by multiplying the gross transportation receipts earned within the State by the tax rate. This led to the asserted inequity that even though a railroad continued to own substantially the same amount of property, it would nevertheless be liable for an increased amount of excise tax—as a function of the increased revenues deriving from increases in rate charges necessitated by higher operational expenses. These allegedly excessive tax burdens arose "not by reason of any increased prosperity" but rather as a result of increased revenues allowed by the Interstate Commerce Commission to defray corresponding increases in the costs of operation. See: Remarks of Representative Merrill, Legislative Record at 597, 83rd Maine Legislature (1927).

As a response to such inequities, the Legislature in 1927 adopted the current "gross-net method" (P.L.1927, Ch. 27) under which the excise tax continues to be measured by gross transportation receipts, but the rate of the tax is made to depend on the ratio of net railway operating income to gross transportation receipts.

Maine Central's claim is that inclusion of incentive per diem charges in the computation of net railway operating income would re-introduce the "mischief" which it was the Legislature's purpose to eliminate by the 1927 adoption of the gross-net method of excise taxation.

We cannot agree.

The function of the excise tax on railroads is to measure and tax the value of a railroad's franchise. Yet, pursuant to the approach prior to 1927, taxes resulted from correlative increases in expenses and rates without a corresponding increase in the prosperity of the railroad. Thus, taxes

flowed from a distorted measurement of the value of the railroad franchise, and this was the "mischief" purported to be remedied by the Legislature's 1927 adoption of the gross-net methodology.

Such mischief—a distorted measurement of the value of the railroad franchise—does not result from including incentive per diem charges in net railway operating income. Although the excise tax burden enters as a cost factor, incentive per diem income constitutes a real addition to the operating income and prosperity of the railroad. Accordingly, insofar as the excise tax operates to measure and to tax the value of the railroad franchise, it is appropriate that the real increase in the value of the franchise occurring by virtue of the incentive per diem funds should be reflected in the railroad's excise tax liability—through the imposition of a higher tax rate on gross transportation receipts.

Maine Central errs, therefore, in characterizing the introduction in 1928 (in consequence of 1927 legislation) of the definition of net railway operating income as indicative of a legislative undertaking to build an *ability-to-pay* mechanism into the excise tax. Proceeding from this error, Maine Central perpetrates the further error of inaccurately asserting that the inclusion in net railway operating income of per diem incentive revenues, which are not available for payment of general corporate expenses such as the excise tax, defeats the legislative objective that net railway operating income should provide the measure of a railroad's ability to pay the excise tax.

Maine Central also argues that the incentive per diem balances do not increase the profitability of the railroad collecting them because the incentive funds are "trust" monies. This is a loose use of the "trust" concept which confuses, rather than assists, correct analysis of the issue before us. It *conceals the reality* that the incentive per diem revenues do increase the total profit and value of creditor railroads to the extent that the incentive charges represent "compensation above and beyond the base costs of freight car ownership." *Illinois Terminal R.R. Co. v. United States,* 541 F.2d 201 (8th Cir. 1976). As revenue in excess of a fair rate of return, the incentive per diem charges enable a creditor railroad to receive an additional return on its current investments in cars in use on other lines without the burden of additional costs. True, the earmarking of funds for use to purchase, build, rebuild or lease unequipped general service boxcars might be some indication of a "trust" relationship. Yet, it is a strong indication to the contrary that the owning railroad is the primary beneficiary of the charges. For example, once the earmarked funds have been expended, plainly any "trust" status is lost; the cars become the outright property of the railroad. In addition, the new cars earn more mileage, as well as ordinary and incentive per diem revenues, and function as cost free additions to the railroad's hauling capacity.

In light of the history and purpose of the Maine Legislature's 1927 amendment, then, we conclude that the correct interpretation of 36 M.R.S.A. § 2624 is that, within the Legislature's intendment, "net railway operating income" includes incentive per diem funds. This conclusion also finds support in the statutory language defining net railway operating income as "including in the computation thereof debits and credits arising from equipment rents." We see no reasonable alternative to holding that incentive per diem income constitutes a "credit" to a railroad arising from the equipment rent of its general service railroad boxcars.

## IV. Application of the Supremacy Clause

■ Having arrived at the statutory interpretation that net railway operating income includes incentive per diem charges for the purpose of the computation of the Maine excise tax on railroads, we turn to the question whether in this particular facet the statute becomes unconstitutional as violative of the Supremacy Clause of Arti-

cle VI of the Constitution of the United States.[5]

Neither the Congress itself nor the Interstate Commerce Commission acting within the powers conferred upon it by Congress has expressly prohibited the State of Maine from requiring, for the purposes of computing the Maine excise tax on railroads, that the revenues from incentive per diem charges be included in net railway operating income. Hence, Maine Central's invoking the Supremacy Clause to prohibit such exercise of Maine's power of taxation must be taken as a claim that such result is mandated, here, by implication from the existence of the federal program in which incentive per diem charges serve an important function.

When the existence of a federal undertaking is thus asserted to deny, by implication, a State's exercise of powers normally possessed by it, the analysis becomes complex because of the relativity of the values at stake and the lack of any single generalized guiding principle. In *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) the Court said:

> "There is not—and from the very nature of the problem there cannot be—any rigid formula or rule which can be used as a universal pattern . . . . This Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula."

With reference specifically to a claim that the Supremacy Clause mandates a de-

nial in particular respects of a State's exercise of its power of taxation, the Court in *Penn Dairies v. Milk Control Commission of Pennsylvania,* 318 U.S. 261, 270–271, 63 S.Ct. 617, 621, 87 L.Ed. 748 (1943) stressed the primacy of state taxing powers, asserting that the federal Constitution

> ". . . presupposes the continued existence of the states functioning in coordination with the national government, with authority in the states to lay taxes . . . ."

Further, in *Hines v. Davidowitz,* supra, the Court indicated that there must be greater play for the concurrent exercise by a state of such of its power as is "bottomed on the . . . broad base . . . [of] its power to tax." (312 U.S. at 68, 61 S.Ct. at 404)

When therefore the claim is, as here, that the existence of a federal program impliedly demands an abridgement of Maine's exercise of its taxing power, the caveat of the Supreme Court of the United States in *Penn Dairies v. Milk Control Commission of Pennsylvania,* supra, has cogent applicability:

> "[W]e should be slow to strike down legislation which the state concededly had power to enact, because of its asserted burden on the federal government. For the state is powerless to remove the ill effects of . . . [such] decision, while the national government, which has the ultimate power, remains free to remove the burden." (318 U.S. at 275, 63 S.Ct. at 624)

With this word of caution in mind we note, initially, that Maine's imposition of an excise tax on the value of a railroad franchise does not inherently, or necessarily, destroy, or directly conflict with, the federal incentive program and its purpose to alleviate the shortage in the national supply of boxcars. Seemingly acknowledging this point, Maine Central concentrates on the

---

5. The Supremacy Clause reads:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

particular feature that Maine includes incentive per diem charges in net railway operating income, as an incident of the methodology by which the Maine excise tax on railroads is computed. It is this special factor, Maine Central argues, which creates serious potential for frustration of the federal incentive program.

We disagree.

Viewing the matter, first, relative to potential impact upon Maine Central as one individual railroad, we believe that despite Maine's inclusion of incentive per diem charges in net railway operating income, Maine Central will continue to have strong incentives to acquire additional boxcars with the use of its per diem incentive funds. Since the incentive per diem charges are charges in excess of the ordinary rate of return, the incentive funds increase the value of the franchise and produce an additional hauling capacity which, upon expenditure of the funds, becomes the outright property of the railroad. The expenditure of incentive funds yields a further benefit to the railroad because the resulting additional car supply earns more mileage and ordinary per diem rates, as well as incentive per diem charges. By acquisition and expenditure of additional incentive funds, the railroad increases both its value and profitability.[6] The burden of excise tax would have to reach very substantial proportions before Maine Central would find it necessary to forego the cost-free benefits of the incentive charges.

In large part Maine Central's argument to show "disincentive" consequences rests on a unique combination of circumstances which happened to result in 1974 in an imposition of the excise tax at a rate higher than the minimum rate. However, because incentive per diem charges as such are not taxed by the excise tax but, rather, are merely included in the computation by which the applicable rate becomes determined, an increase of incentive funds need not necessarily produce a greater excise tax liability. For example, in the years 1970 to 1973 the amount of Maine Central's excise tax liability to the State of Maine would not have changed if the incentive per diem charges had been excluded from net railway operating income. The year 1974 was unusual. Because Maine Central's earnings were the highest in its 112 year history, the excise tax rate increased from the minimum rate of 3¼% of the gross transportation receipts to the next level rate of 3¾%. For 1975, Maine Central's tax returned to the minimum rate.[7]

Maine Central's excise tax rate for 1974 also happened to reflect the special fact that there was at that time a higher rate of incentive per diem charges authorized by the Interstate Commerce Commission. As originally promulgated, incentive charges were imposed on a 6 month basis from September to February each year. Effective May 1, 1973, during the Russian wheat sales, the Commission extended the incentive charges to a year round basis. As based on these rates, therefore, the additional incentive per diem charges, representing a return beyond the 6% ordinary rate of return, equalled 6% annually from 1970 to 1972, approximately 10% in 1973, 12% in 1974 and 1975, and 6% thereafter. See: Incentive Per Diem Charges—1968, 337 I.C.C. 217, 225, 246 (1970) and Incentive Per Diem Charges—1968, 350 I.C.C. 473 (1975). Since the Commission indefinitely cut incentive charges in half (back to 6%) effective September 15, 1975, it would appear for the future that Maine Central can continue to acquire and expend greater amounts of incentive funds without exceeding the minimum rate of taxation, at least

---

6. In 1974, for example, Maine Central's boxcars earned an average of $737 per general service unequipped boxcar, which resulted in an additional excise tax of $197 per general service unequipped boxcar.

7. The rates are as follows: 3¼% when NROI (net railroad operating income) does not exceed 10% of GTR (gross transportation receipts); 3¾% when NROI is between 10 and 15% of GTR; 4¼% when NROI is between 15 and 20% of GTR; 4¾% when NROI is between 20 and 25% of GTR; and 5¼% when NROI exceeds 25% of GTR.

in the absence of another record breaking year of income earnings.[8]

Maine Central argues that the inclusion of incentive per diem charges within net railway operating income will frustrate the federal incentive program because it will result in an excise tax burden on general corporate assets likely to leave insufficient general funds from which Maine Central can meet the basic test period quota (discussed in n. 4, supra)—a quota which the railroad must acquire with general assets before it may utilize the segregated incentive funds. In addition to doubts we entertain that the test period quota has the severity Maine Central purports to attribute to it,[9] we believe that appropriate use of its financial planning resources will enable Maine Central readily to compute the level at which generation of additional incentive charges will excessively burden general corporate assets.

While there could be a point at which, because of an unlimited increase in incentive funds, the excise tax burden on general corporate funds could be so heavy as to eliminate further incentive for, or ability of, an *individual* railroad to acquire additional boxcars, this cannot be dispositive in the determination of whether the *national* incentive program will be frustrated. Indeed, it is an infirmity of Maine Central's argument that it would relate the incentive program *exclusively* to the resulting financial impact on an individual railroad and its financial incentive to acquire additional boxcars. Maine Central thus ignores the underlying nature and purpose of the federal boxcar program. Acquisition of additional boxcars by *individual* owning railroads represents only one alternative mechanism for the achievement of the federal goal of an adequate *national* supply of boxcars. Even on the assumption that the excise tax could produce adverse consequences for Maine Central which might destroy incentive for Maine Central to acquire additional boxcars, the federal regulations still require that every dollar of incentive per diem funds available after income tax payments be spent on the acquisition and maintenance of additional boxcars. The ICC regulations specifically anticipate, and deal with the prospect, that individual railroads will refuse to spend incentive funds on additional boxcars. In such situation the regulations approve, and by imposition of certain investigative procedures mandate, the transfer of unused earmarked incentive funds to Rail Box. 49 C.F.R. § 1036.4. Thus, the existence of Rail Box, as a corporation organized to acquire, own and lease a fleet of boxcars, guarantees expenditure of the federal incentive funds without the danger of frustration of the *national* program by the actions of *individual* railroads.[10]

8. The ICC eliminated year round application of the incentive, believing that continuation could not "be justified because of the present surplus of unequipped general service boxcars." The Commission continued the 6 month rate, however, deeming the supply of boxcars still inadequate because of the decline in their ownership and the temporary decline in demand.

Maine Central also argues that it had insufficient funds in 1975 with which to pay the tax imposed for 1974. This difficulty merely reflects inadequate planning by the railroad. Maine Central's 1974 balance reflects $1,004,-105 in unrestricted ordinary income available for general corporate purposes and expenses, including payment of the additional $615,000 in excise tax. In addition, other funds available for payment of the excise tax included $3,569,-207 in extraordinary income from the sale of the Mattawamkeag to Vanceboro line in 1974.

9. See: The Freight Car Shortage and ICC Regulation, 85 Harv.L.Rev. 1583 (1972).

10. The overall scheme of the federal incentive charge program indicates its purpose to increase the national supply of boxcars without regard to distribution of ownership by *individual* railroads. (In fact, railroads which do not own boxcars receive no help by the incentive program; only owning railroads receive additional revenue from the incentive charges). Since the boxcar shortage arose as a result of the interchange of railroad freight cars at the end of each railroad's line, the incentive program, to the extent it relies on acquisition of additional boxcars by individual railroads, will be successful only so long as the incentive charges remain in effect. In contrast, acquisition of additional boxcars by Rail Box, as a corporation dedicated solely to the acquisition and maintenance of an adequate supply of boxcars, may in fact improve the supply and efficiency of the boxcar pool by direct recognition of the existence of a "national pool of boxcars."

The underlying fallacy of Maine Central's argument is that it assumes as realistic financial possibilities only those lying at the two end-poles of a continuum of financial possibilities. Maine Central projects that either (1) incremental increase in the excise tax rate will destroy *all incentive* of a railroad to acquire additional boxcars; or (2) at the opposite pole, the incentive funds generated by the railroad will be of so great a magnitude that the resulting increase in the level of excise tax liability will destroy *the ability* of the railroad to meet its basic acquisition quota from its general funds.

We are not persuaded by this analysis because we find it artificially extreme. It overlooks the reality that railroads engage in financial planning and can devise strategies, in relation to possible excise tax liabilities, which will tend to prevent the occurrence of the above-described extreme situations. Through planning railroads can place themselves in intermediate financial postures tending to protect general corporate assets while simultaneously permitting enjoyment of the benefits to be derived from participation in the federal boxcar incentive program.[11]

The existence, and functioning, of Rail Box further indicates that the manner of Maine's imposition of its excise tax on railroads need not unduly interfere with the federal program of generating a nationwide acquisition of a substantial number of additional boxcars. In the circumstances when the tax might begin to operate as a disincentive to certain marginal or incremental additional boxcar acquisitions, the requirement for surrender of the funds to Rail Box will work toward achieving complete expenditure of the funds, thus to produce an optimal increase in the national supply of boxcars.

On the basis of the foregoing analysis we are satisfied that Maine's inclusion of incentive per diem charges in net railway operating income, for the computation of the Maine excise tax on railroads, has no direct, generalized tendency to affect the federal boxcar incentive program so adversely as to require, by force of the Supremacy Clause of the Constitution of the United States, the nullification of that particular exercise of Maine's power of taxation *by implication* from the existence, and needs, of the federal program.[12]

11. The agreed statement of facts contains the depositions of two witnesses, the President of Maine Central and a Cost Analyst of the ICC. The parties agreed that the testimony contained in the depositions is the testimony that the witnesses "would give . . . if under oath and present and testifying." Both witnesses suggested that inclusion of the incentive funds in the computation of the Maine excise tax would create an adverse impact on the federal incentive program. However, we are free to evaluate and to disregard the testimony and conclusions of these witnesses and to draw such factual inferences and legal conclusions as warranted by the report of the entire case to this Court.

12. The ICC regulations allowing payment of income taxes attributable to the incentive charges do not require a contrary result. While the ICC's allowing payment of income tax from the restricted funds may evidence intent to prevent imposition of additional income tax burden on general corporate funds as a result of the incentive charges, it nevertheless *also* indicates that such tax burdens as flow from an income tax on the restricted funds are not deemed to impair the federal program. In similar vein, the ICC could see fit to allow a deduction from the incentive fund for the pay-

ment of State excise taxes. That the ICC has not yet seen fit to allow any such deductions or payments from the restricted incentive funds suggests to us, objectively, that any other liabilities resulting from the incentive fund are deemed to be an acceptable burden on general corporate funds. In fact, in a 1973 report on the incentive program, the ICC expressly recognized that the incentive funds would create certain liabilities on the railroad corporation for which no general funds existed, and that this would not frustrate the federal incentive program. In response to a question concerning a carrier which became liable for payment of contingent interest and bond sinking fund contributions, because of bond indenture requirements resulting from inclusion of incentive per diem in an ordinary income, the ICC answered:

"Regardless of the fact that by including incentive per diem in ordinary income an interest liability is created for which there are no funds available, current accounting rules require that all car per diem income must be recorded in the ordinary income account."

See: Incentive Per Diem Charges—1968, 343 I.C.C. 55 (1973) (informal answer to question 8).

## V. The Commerce Clause

As an alternative constitutional attack, Maine Central maintains that the formula for apportionment of net railway operating income, as applied when incentive per diem charges are included in net railway operating income, becomes violative of the Commerce Clause (Section 8 of Article I) of the Constitution of the United States.

To avoid violation of the Commerce Clause, in general, the Maine railroad excise tax utilizes an apportionment formula to determine the in-state elements of the gross transportation receipts and net railway operating income of the railroads engaged in interstate operations. The formula is stated as follows:

> "The gross transportation receipts of such [an interstate] railroad, line or system, as the case may be, over its whole extent, within and without the State, shall be divided by the total number of miles operated to obtain the average gross transportation receipts per mile, and the gross transportation receipts in the State shall be taken to be the average gross transportation receipts per mile multiplied by the number of miles operated within the State, and the net railway operating income within the State shall be similarly determined." (36 M.R.S.A. § 2624)

Maine Central's contention is that this formula, regardless of whether it may generally operate to protect against Commerce Clause violation, produces a contravention of the Commerce Clause in the particular circumstances, as here, in which incentive per diem charges are included in net railway operating income for purposes of computing the railroad excise tax. Maine Central points out that 765 miles of its total of 908 miles of track are located in Maine. In light of this fact the inclusion of incentive per diem charges in net railway operating income produces the result, says Maine Central, that application of the apportionment formula attributes to the State of Maine 84.25% of the net freight car rental charges and net incentive per diem charges even though, in 1974, less than 3% of Maine Central's freight car rental charges and in-

centive per diem charges came from boxcar rentals *within* Maine.

■ The cases of *Central Greyhound Lines, Inc. v. Mealey,* 334 U.S. 653, 662–663, 68 S.Ct. 1260, 92 L.Ed. 1633, 1641 (1948) and *Gwin, White & Prince, Inc. v. Henneford,* 305 U.S. 434, 59 S.Ct. 325, 83 L.Ed. 272 (1939) on which Maine Central relies to support its argument are distinguishable. These cases stand for the proposition that an *unapportioned* tax on, or measured by, the gross receipts of an interstate corporation violates the Commerce Clause. But the tax here is not *unapportioned;* an apportionment formula is utilized. Maine Central's claim is that the formula results in improper apportionment allocations. However, that a formula may produce a mathematically inexact apportionment does not per se establish a violation of the Commerce Clause; rough approximation, as a practical matter, is the norm of any state taxation system. *Illinois Central R.R. Co. v. Minnesota,* 309 U.S. 157, 161, 60 S.Ct. 419, 84 L.Ed. 670 (1940). In addition, the party attacking the apportionment formula carries the distinct burden of proving by "clear and cogent evidence" that it results in taxation of extraterritorial values. *Butler Brothers v. McColgan,* 315 U.S. 501, 507, 62 S.Ct. 701, 86 L.Ed. 991 (1942). Indeed, as further explained in *Central Greyhound Lines, Inc. v. Mealey, supra,* one of the primary cases on which Maine Central relies,

> "[T]he tax may constitutionally be sustained on the receipts from the transportation apportioned as to the mileage within the State." (334 U.S. at 663, 68 S.Ct. at 1266)

See also: *Canton R.R. Co. v. Rogan,* 340 U.S. 511, 515–516, 71 S.Ct. 447, 95 L.Ed. 448 (1951) (approval of railroad mileage apportionment formula).

A prior version of the present Maine excise tax was sustained by the United States Supreme Court over a Commerce Clause attack in *Maine v. Grand Trunk Railway Co.,* 142 U.S. 217, 12 S.Ct. 121, 35 L.Ed. 994 (1891). *Grand Trunk,* an authority not challenged by Maine Central, upheld the

1881 version of the excise tax which imposed a franchise tax measured solely by the gross receipts of the railroad and apportioned by a mileage formula almost identical to that of the present tax. We understand Maine Central to be claiming, here, that *Grand Trunk* loses its precedential force in the face of the allegedly distinguishing circumstance that incentive per diem charges are made an additional element of net railway operating income for purposes of computation of the rate of excise tax.

In our view, however, *Grand Trunk* becomes distinguishable neither in result nor rationale by the presence of this additional factor. *Grand Trunk* carefully explained that the Maine tax was apportioned according to the *value of the railroad franchise.* The levy was not on gross transportation receipts; rather, gross transportation receipts constituted the means of ascertaining the value of the privileges conferred. 142 U.S. at 228, 230, 12 S.Ct. 121. As subsequently explained in *Galveston, Harrisburg, & San Antonio Ry. Co. v. Texas,* 210 U.S. 217, 28 S.Ct. 638, 52 L.Ed. 1031 (1908), the Maine statute, significantly, taxed only the value of the franchise, and this was taxed as property in lieu of certain local ad valorem property taxes rather than as receipts of transportation. Characterizing the systemic scheme of the Maine excise tax on railroads, the *Galveston* Court said:

> "The buildings of the railroad and its lands and fixtures outside of its right of way were to be taxed locally, as other property was taxed, and this excise with the local tax were to be in lieu of all taxes. The language shows that the local tax was not expected to include the additional value gained by the property being part of a going concern. . . . The excise was an attempt to reach that additional value." (210 U.S. at 226, 28 S.Ct. at 640)

It is of prime importance here, then, that the present excise tax continues the identical scheme embodied in the 1881 statute, by operating in lieu of local property taxes on the value of the franchise. See also: *Railway Express Agency, Inc. v. Virginia,* 358 U.S. 434, 444, 79 S.Ct. 411, 3 L.Ed.2d 450 (1959); *Illinois Central R.R. Co. v. Minnesota,* 309 U.S. 157, 60 S.Ct. 419, 84 L.Ed. 670 (1940); *Cudahy Packing Co. v. Minnesota,* 246 U.S. 450, 38 S.Ct. 373, 62 L.Ed. 827 (1918); and *United States Express Co. v. Minnesota,* 223 U.S. 335, 32 S.Ct. 211, 56 L.Ed. 459 (1912). As the *Galveston* case, supra, explained, the validity of a franchise tax, insofar as it is a tax upon the property value of the railroad's franchise as augmented by the value of the railroad's interstate commerce, depends on consideration of the value of the *entire franchise* including therein its interstate operations; and the resort to trackage as the basis on which the apportionment formula rests may be taken as "a measure of *the value of the property* per mile." (emphasis supplied) (210 U.S. at 226, 28 S.Ct. at 640)[13] We find unpersuasive, therefore, Maine Central's argument that the validity of the apportionment formula, as here applied, is to be assessed by considering income from freight rentals *in isolation from the totality* of the railroad's operating income.

■ The 1927 addition of net railway operating income as a factor in the rate computation modifies the tax in a manner solidifying its status as a franchise tax. A tax measured in part by net income more accurately reflects the value of the franchise than a tax measured solely by gross receipts. See: *United States Glue Co. v. Oak Creek,* 247 U.S. 321, 38 S.Ct. 499, 62 L.Ed. 1135 (1918). Accordingly, the 1927 amendment presently in effect insulates the tax, even beyond the protection afforded by the

---

**13.** *Galveston* stressed that the State has the right to tax the franchise, as property, "at its actual value *as a going concern.*" (emphasis supplied) (210 U.S. at 227, 28 S.Ct. at 640) Further explaining, the Court said: "As the property of companies engaged in such commerce . . . may be taxed at its value as it is, in its organic relations, and not merely as a congeries of unrelated items, taxes on such property have been sustained that took account of the augmentation of value from the commerce in which it was engaged." (210 U.S. at 225, 28 S.Ct. at 639)

 

approval in *Grand Trunk,* from attack as a gross receipts tax on interstate commerce.

"The Court long since ha[s] recognized that interstate commerce may be made to pay its way." *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326, 334 (1977)

The inclusion of per diem incentive charges in net railway operating income does not cause a malapportionment violative of the Commerce Clause of the Constitution of the United States.

### VI. The Counterclaim of Defendant

Plaintiff's reply to defendant's counterclaim raises no issues beyond those above considered. The effect of the pleadings is thus to establish that in the event this Court should rule against plaintiff Maine Central on its statutory interpretation and constitutional contentions, as the Court has herein ruled, plaintiff concedes its liability for the 1974 railroad excise tax in the amounts asserted in the counterclaim of defendant State Tax Assessor.

The entry is:

(1) It is adjudicated: (a) correctly interpreted, 36 M.R.S.A. § 2624 requires for purposes of the computation of the Maine excise tax on railroads, that incentive per diem charges be included in net railway operating income; (b) thus interpreted, 36 M.R.S.A. § 2624 violates neither the Supremacy Clause of Article VI nor the Commerce Clause (Section 8 of Article I) of the Constitution of the United States;

(2) the case is remanded to the Superior Court with directions that said Court order (a) as to plaintiff's complaint, that judgment be entered in favor of the defendants; and (b) as to the counterclaim of defendant State Tax Assessor, that judgment be entered for defendant State Tax Assessor in the amounts sought by the counterclaim.

POMEROY, J., did not sit.

DUFRESNE, A. R. J., sat at oral argument as Chief Justice, but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.

WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ., and DUFRESNE, A. R. J., concurring.

