MAINE CENTRAL RAILROAD
COMPANY

v.

Raymond L. HALPERIN et al.

Supreme Judicial Court of Maine.

Dec. 27, 1977.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster by William C. Smith, James G. Good, Portland, for plaintiff.

Clifford B. Olson, Jerome S. Matus, Asst. Attys. Gen., Augusta, Henri Francis Rush, Alan W. Heifetz, I. C. C., Washington, D. C., for defendants.

Before DUFRESNE, C. J., and WERNICK, ARCHIBALD and GODFREY, JJ.

WERNICK, Justice.

*On motion for reconsideration.*

Plaintiff Maine Central has moved for reconsideration of the Court's November 16, 1977 opinion in this case. 379 A.2d 980. Maine Central's motion asks us to address the issue

"whether the imposition of the Maine Railroad Excise Tax under the specific circumstances affecting Maine Central's 'net railway operating income' in 1974 contravened the Commerce [Clause] . . . ."

Maine Central suggests that this question became obscured, inadvertently, in the attention concentrated on the broader argument that it is facially unconstitutional to include incentive per diem income in the "net railway operating income" used to compute the excise tax on railroads. Although we are satisfied that in its fundamental import our original opinion sufficiently covered the "as applied" issue now being raised, in the interest of full clarity we deem it appropriate to add a clarifying supplement. It is true that in our original opinion we gave extensive consideration to the "unique combination of circumstances" which occurred in 1974 in arriving at our decision reviewing Maine Central's challenge predicated on the Supremacy Clause of the Constitution of the United States, a decision which Maine Central has not asked us to reconsider.[1] We did not, however, ignore the 1974 circumstances in addressing the Commerce Clause question. On that issue the purport of our decision was that even in relation to the special circumstances of 1974, the application of the mileage apportionment formula to net railway operating income did not contravene the Commerce Clause.

In Part II of its motion Maine Central relies on *Norfolk & Western Ry. Co. v. Missouri State Tax Commission*, 390 U.S. 317, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968) to support the contention that the excise tax as applied in 1974 violated the Commerce Clause. In the *Norfolk* case, the Supreme Court ruled that

"when a taxpayer comes forward with strong evidence tending to prove that the mileage formula will yield a grossly distorted result in its particular case, the State is obligated to counter that evidence or to make the accommodations necessary to assure that its taxing power is confined to its constitutional limits. If it fails to do so and if the record shows that the taxpayer has sustained the burden of proof to show that the tax is so excessive as to burden interstate commerce, the taxpayer must prevail." (390 U.S. p. 329, 88 S.Ct. p. 1003)

We reiterate our original conclusion that the taxpayer has not met its burden of proving that the mileage formula will yield a "grossly distorted" result.

The alleged "evidence" of distortion is that in the special 1974 situation the effect of the imposition of the Maine excise tax was to attribute to the State of Maine 84.25% of Maine Central's net freight car rental and incentive per diem charges when in fact only 2.62% of these receipts had been earned as the rentals from cars used in Maine. The error of this approach lies in the error of its premise, that each component of the value of the railroad franchise may be broken down and examined separately to determine whether the tax is prop-

---

1. Our original opinion ruled that the Maine Excise Tax even as applied to Maine Central in 1974 would not frustrate the incentive of Maine Central to participate extensively in the federal program and that any disincentives created by the tax would be overcome by the expenditure of the incentive funds by Rail Box in furtherance of the federal purpose of increasing the national supply of railroad boxcars.

erly apportioned as to that particular component of the value of the railroad franchise.

In this regard, contrary to Maine Central's contention, the distinction between the Maine Excise Tax on Railroads and a tax such as the ad valorem tax in *Norfolk & Western*, supra, becomes of primary importance. In *Norfolk & Western*, Missouri had imposed an ad valorem tax on "all real property . . . [and] tangible personal property" owned, hired or leased by any railroad company "in this state." Application of Missouri's mileage apportionment formula to a foreign railroad corporation resulted in a determination that 8% of the railroad's rolling stock was located in Missouri. Direct evidence, however, established that on tax day (and generally throughout the year in approximately the same proportions) only 2.71% of the total fleet of rolling stock was located in Missouri. The *Norfolk* Court rejected Missouri's attempt to uphold the tax on the basis of the enhancement or augmentation in value of the *tangible* property produced by its connection with, and organic relation to, the integrated railroad system. The tax was thus held to violate the Commerce Clause because it was imposed on tangible property not located in the state. In the instant case, in contrast, the tax does not fall on property outside of the state but rather is imposed on the value of the local railroad franchise as apportioned and measured by net railway operating income and gross transportation receipts throughout the entire railroad system.

In an ad valorem tax system, although the augmentation in value attributed to the existence of tangible property as part of a going concern is a relevant factor in valuing the individual units of tangible property located in the state, the validity of the apportionment may be broken down to individual units such as the value of the rolling stock and the value of terminal facilities. However, as we pointed out in our original opinion, the apportionment of an excise tax on a railroad franchise presents a distinguishable situation.

The excise tax is imposed on the value of the local franchise valued as a going concern "in its organic relations, and not merely as a congeries of unrelated items . . ." (*Galveston* [*Galveston, Harrisburg & San Antonio Ry. Co. v. Texas*, 210 U.S. 217, 28 S.Ct. 638, 52 L.Ed. 1031 (1908)] cited in n. 13). In short, with respect to the apportionment of an excise tax, it is improper to consider the validity of the apportionment as it relates to component parts of the value of the railroad franchise such as rental and incentive per diem income because the tax is not imposed on those items. Instead, a proper evaluation of the apportionment formula requires valuation of the entire franchise as a going concern. The difference in the method of apportionment results from the subject of the tax. An ad valorem tax is imposed on tangible property; the percentage attributable to each state and the value of that property even as a part of a unitary system can largely be determined separately for each individual type of property. The property value of the railroad franchise, however, can only be determined as a whole by looking first to the entire franchise and then attempting to apportion to the taxing state a fair share of that value.

Although we recognize that *Complete Auto Transit Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) abrogated artificial distinctions between a "privilege" and a "franchise" tax, we believe that here the distinction between a franchise tax and an income or ad valorem property tax retains significant substantive meaning in relation to the appropriate method of valuation and apportionment. Hence, we reiterate the conclusion of our original opinion, that we find unpersuasive Maine Central's argument that the validity of the apportionment formula, as here applied, is to be assessed by considering income from freight rentals in isolation from the totality of the railroad's operating income.

We do not forget that in the valuation of the local franchise of a railroad corporation the railroad's property located in another state can be taken into account only if

"it can be seen in some plain and fairly intelligible way that it adds to the value of the road and the rights exercised in the State." *Wallace v. Hines*, 253 U.S. 66, 69, 40 S.Ct. 435, 436, 64 L.Ed. 782 (1920)[2]

The basic rental and incentive charges here clearly add to the value of the railroad franchise in the State of incorporation and the major place of doing business. Because the interchange of railroad boxcars is mandatory, the value of the local railroad franchise is not limited to the value of property and privileges located at the situs of the railroad's trackage. The interchange of boxcars and the contracts executed pursuant thereto which provide for the incentive and basic rental charges increase the value of the local railroad franchise by enabling the railroad to participate in and receive the benefits of the "single common pool" of railroad boxcars. Moreover, the basic rental charges, in fact, immediately become part of the railroad's general corporate assets and the incentive income becomes part of general corporate assets when transformed by expenditure on additional boxcars. Thus, in light of the mandatory interchange of boxcars and the *significant financial benefits to the railroad even after it pays the costs of the excise tax*, we conclude, as before, that the taxpayer has not sustained its burden of proving that an excessive burden on interstate commerce resulted in 1974 from application of the Maine excise tax.

In *Maine v. Grand Trunk Railway Co.*, 142 U.S. 217, 12 S.Ct. 163, 35 L.Ed. 994 (1891), the United States Supreme Court upheld a prior version of the present Maine excise tax. In *Western Live Stock v. Bureau*, 303 U.S. 250, 256, 58 S.Ct. 546, 82 L.Ed. 823 (1938), *Grand Trunk* was cited with apparent approval as upholding a fairly apportioned tax on the value of the local privilege or franchise as measured by gross receipts from interstate commerce. We believe that *Grand Trunk* remains viable authority justifying us in upholding the same mileage apportionment formula in its application to the circumstances presently before us. As we observed in our original opinion, the 1927 addition of net railway operating income as a factor in rate computation results in an even more accurate reflection of the value of the railroad franchise.

The entry is:

(A) The stay of proceedings in the Superior Court ordered by this Court on December 7, 1977 pending this Court's consideration of the motion for reconsideration is lifted;

(B) This Court's prior entry of adjudication is reaffirmed and supplemented to read as follows:

(1) It is adjudicated: (a) correctly interpreted, 36 M.R.S.A. § 2624 requires, for purposes of the computation of the Maine excise tax on railroads, that incentive per diem charges be included in net railway operating income; (b) thus interpreted, 36 M.R.S.A. § 2624, taken facially as well as in its application to the circumstances of the present case, violates neither the Supremacy Clause of Article VI nor the Commerce Clause (Section 8 of Article I) of the Constitution of the United States;

(C) The case is remanded to the Superior Court with directions that said Court order (a) as to plaintiff's complaint, that judgment be entered in favor of the defendants; and (b) as to the counterclaim of defendant State Tax Assessor, that judgment be entered for defendant State Tax Assessor in the amounts sought by the counterclaim.

POMEROY, J., did not participate.

2. *Wallace* was cited in the *Norfolk & Western* case on which Maine Central relies. *Wallace* involved a tax on a foreign corporation, whereas the instant tax is on a domestic corporation. In *Wallace*, the special excise tax was invalidated because most of the major terminals (and thus most of the railroad's value) were located in other states even though a large amount of the railroad's trackage was in the taxing state. Here, in addition to the value of the benefits and protections accorded by Maine as the state of incorporation, no evidence in the record suggests other than that the major part of the value of the entire railroad franchise is located in the State of Maine.

DELAHANTY, J., did not participate in the consideration of the motion for reconsideration.

DUFRESNE, A. R. J., who sat at oral argument as Chief Justice and joined in the original opinion as Active Retired Justice, has joined in this opinion as Active Retired Justice.

ARCHIBALD, GODFREY, JJ., and DU-FRESNE, A. R. J., concurring.