PENN DAIRIES, INC., ET AL. *v.* MILK CONTROL COMMISSION OF PENNSYLVANIA.

No. 399. Argued January 13, 1943.—Decided March 1, 1943.

*Solicitor General Fahy* argued the cause for the United States; *Mr. Harris C. Arnold* for Penn Dairies, Inc. *Assistant Attorney General Shea* and *Messrs. Archibald Cox, Morton Liftin,* and *Gerald A. Gleeson* were with them on the brief, for appellants.

264

*Mr. Frank E. Coho,* Deputy Attorney General of Pennsylvania, with whom *Messrs. Claude T. Reno,* Attorney General, and *E. Russell Shockley* were on the brief, for appellee.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

Decision of this case turns on the question whether the minimum price regulations of the Pennsylvania Milk Control Law of April 28, 1937, P. L. 417, Purdon's Pa. Stat. Ann., Tit. 31, § 700j, may constitutionally be applied to the sale of milk by a dealer to the United States, the sale being consummated within the territorial limits of the state in a place subject to its jurisdiction.

The Pennsylvania Milk Control Law establishes a milk control commission, § 201, with authority to fix prices for milk sold within the state wherever produced, §§ 801–803, including minimum wholesale and retail prices for milk sold by milk dealers to consumers, § 802, and to issue rules, regulations and orders to effectuate this authority, § 307.

In the fall of 1940 the United States established, under a permit from the Commonwealth of Pennsylvania, a military encampment on lands belonging to the Commonwealth. As is conceded, the permit involved no surrender of state jurisdiction or authority over the area occupied by the camp. On February 1, 1941, the purchasing and contracting officer at the encampment, an officer of the Quartermaster Corps of the United States Army, invited bids for a supply of milk for the period from March 1 to June 30, 1941, for consumption by troops stationed at the camp. On February 4, the Milk Control Commission sent a notice to interested parties, including appellant, Penn Dairies, Inc., a Pennsylvania corporation, addressed to "all milk dealers interested in submitting bids to furnish milk to the United States Government" at the encampment. The notice was accompanied by the Commission's Official General Order No. A–14, § 4–B of which prescribed the "minimum wholesale prices to be charged by or paid to milk dealers." The notice announced that the unit prices specified for sales to institutions by that section of the order should be considered in the preparation of bids and that sales of milk at prices below the prescribed minima would be construed as violations of the milk control law. The dairy submitted a bid offering to sell milk in wholesale quantities at prices substantially below those prescribed by the Commission. Its bid was accepted by a War Department Purchase Order of March 1, 1941, the contract was awarded to it as the lowest bidder, and it performed the contract by deliveries of the milk at the contract price—all within the state.

On March 5, 1941, the Commission, pursuant to §§ 404 and 405 of the Milk Control Act, issued a citation to the dairy to show cause why its application for a milk dealer's license for the year beginning May 1, 1941, should not be denied because of its sale and delivery of the milk at prices below the minima fixed by the Commission's order.

Section 404 makes the grant of a license mandatory save in circumstances not now material, but provides that the Commission may deny or cancel a license where the applicant or licensee "has violated any of the provisions of this Act or any of the rules, regulations or orders of the Commission . . ."

The dairy's answer to the citation challenged the constitutional authority of the state to regulate prices charged to the United States. After a hearing the Commission denied the dairy's license application because of its sale of milk to the United States at prices below those fixed by the Commission. The Commission's order was sustained on review by the Court of Common Pleas of Lancaster County. The Superior Court affirmed this judgment, 148 Pa. Super. 261, 24 A. 2d 717, in an opinion which was adopted by the Supreme Court of Pennsylvania, 344 Pa. 635, 26 A. 2d 431, both courts holding that the Commission's price-fixing order was applicable to sales of milk made to the United States, and that as thus applied the statute did not impose an unconstitutional burden on the United States or otherwise infringe the Constitution or laws of the United States. The case comes here on appeal under § 237 of the Judicial Code. The government was granted leave to intervene in the Court of Common Pleas, and has participated in all subsequent stages of the litigation.

Appellants urge that the Pennsylvania Milk Control Act, as applied to a dealer selling to the United States, violates a constitutional immunity of the United States, and also conflicts with federal legislation regulating purchases by the United States and therefore cannot constitutionally apply to such purchases.

Appellants' first proposition proceeds on the assumption that local price regulations normally controlling milk dealers who carry on their business within the state, when applied to sales made to the government, so burden it

or so conflict with the Constitution as to render the regulations unlawful. We may assume that Congress, in aid of its granted power to raise and support armies, Article I, § 8, cl. 12, and with the support of the supremacy clause, Article VI, § 2, could declare state regulations like the present inapplicable to sales to the government. Cf. *Pittman* v. *Home Owners' Loan Corp.*, 308 U. S. 21, 33; *Federal Land Bank* v. *Bismarck Co.*, 314 U. S. 95, 101–04; *Parker* v. *Brown*, 317 U. S. 341, 350–351, and cases cited. But there is no clause of the Constitution which purports, unaided by Congressional enactment, to prohibit such regulations, and the question with which we are now concerned is whether such a prohibition is to be implied from the relationship of the two governments established by the Constitution.

We may assume also that, in the absence of Congressional consent, there is an implied constitutional immunity of the national government from state taxation and from state regulation of the performance, by federal officers and agencies, of governmental functions. *Ohio* v. *Thomas*, 173 U. S. 276; *Johnson* v. *Maryland*, 254 U. S. 51; *Hunt* v. *United States*, 278 U. S. 96; *Arizona* v. *California*, 283 U. S. 423. But those who contract to furnish supplies or render services to the government are not such agencies and do not perform governmental functions, *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, 524–5; *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 149; *Buckstaff Co.* v. *McKinley*, 308 U. S. 358, 362–63 and cases cited; cf. *Susquehanna Co.* v. *Tax Comm'n*, 283 U. S. 291, 294; *Helvering* v. *Mountain Producers Corp.*, 303 U. S. 376, 385–86, and the mere fact that non-discriminatory taxation or regulation of the contractor imposes an increased economic burden on the government is no longer regarded as bringing the contractor within any implied immunity of the government from state taxation or regulation. *Alabama* v. *King & Boozer*, 314 U. S. 1, 9, and cases cited;

*Baltimore & Annapolis R. Co.* v. *Lichtenberg,* 176 Md. 383, 4 A. 2d 734, s. c., *United States* v. *Baltimore & Annapolis R. Co.,* 308 U. S. 525.

Here the state regulation imposes no prohibition on the national government or its officers. They may purchase milk from whom and at what price they will, without incurring any penalty. See the opinion below, 148 Pa. Super. 270–71. As in the case of state taxation of the seller, the government is affected only as the state's regulation may increase the price which the government must pay for milk. By the exercise of control over the seller, the regulation imposes or may impose an increased economic burden on the government, for it may be assumed that the regulation if enforcible and enforced will increase the price of the milk purchased for consumption in Pennsylvania, unless the government is able to procure a supply from without the state, see *Baldwin* v. *Seelig,* 294 U. S. 511. But in this burden, if Congress has not acted to forbid it, we can find no different or greater impairment of federal authority than in the tax on sales to a government contractor sustained in *Alabama* v. *King & Boozer, supra;* or the state regulation of the operations of a trucking company in performing its contract with the government to transport workers employed on a Public Works Administration project, upheld in *Baltimore & Annapolis R. Co.* v. *Lichtenberg, supra;* or the local building regulations applied to a contractor engaged in constructing a postoffice building for the government, sustained in *Stewart & Co.* v. *Sadrakula,* 309 U. S. 94.

The trend of our decisions is not to extend governmental immunity from state taxation and regulation beyond the national government itself and governmental functions performed by its officers and agents. We have recognized that the Constitution presupposes the continued existence of the states functioning in coördination with the national government, with authority in the states to lay

taxes and to regulate their internal affairs and policy, and that state regulation like state taxation inevitably imposes some burdens on the national government of the same kind as those imposed on citizens of the United States within the state's borders, see *Metcalf & Eddy* v. *Mitchell, supra,* 523–24. And we have held that those burdens, save as Congress may act to remove them, are to be regarded as the normal incidents of the operation within the same territory of a dual system of government, and that no immunity of the national government from such burdens is to be implied from the Constitution which established the system, see *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 483, 487.

Since the Constitution has left Congress free to set aside local taxation and regulation of government contractors which burden the national government, we see no basis for implying from the Constitution alone a restriction upon such regulations which Congress has not seen fit to impose, unless the regulations are shown to be inconsistent with Congressional policy. Even in the case of agencies created or appointed to do the government's work we have been slow to infer an immunity which Congress has not granted and which Congressional policy does not require. *Reconstruction Finance Corp.* v. *Menihan Corp.,* 312 U. S. 81, and cases cited; *Colorado Bank* v. *Bedford,* 310 U. S. 41, 53, and cases cited; cf. *Baltimore National Bank* v. *Tax Commission,* 297 U. S. 209. Our inquiry here, therefore, must be whether the state's regulation of this contractor in a matter of local concern conflicts with Congressional legislation or with any discernible Congressional policy.

To establish such a conflict the government places its reliance on Acts of Congress requiring competitive bidding in the purchase of supplies for the Army. Section 3709 of the Revised Statutes, 41 U. S. C. § 5, requires public advertising for all government purchases save "when immediate delivery or performance is required by the public ex-

igency."[1] A similar provision had appeared in § 5 of the Act of March 3, 1809, 2 Stat. 536, which required all purchases by the Treasury, War or Navy Departments to be made "by open purchase, or by previously advertising for proposals respecting the same." The Appropriation Act of March 2, 1901, 31 Stat. 905, and subsequent appropriation acts, included a provision requiring public advertising for the purchase of all supplies for the use of the Army, with exceptions not now material, "except in case of emergency or where it is impracticable to secure competition" and requiring the purchase of such supplies "where the same can be purchased the cheapest, the quality and cost of transportation and the interests of the Government considered." 10 U. S. C. § 1201. And a provision enacted as part of the Appropriation Act of July 5, 1884, 23 Stat. 109, 10 U. S. C. § 1200, requires that all purchases of quartermaster's supplies be made by contract after public notice and that the award be made to "the lowest responsible bidder for the best and most suitable article, the right being reserved to reject any and all bids."

It is to be noted that while these statutes direct government officials to invite competitive bidding by contractors undertaking to furnish Army supplies, and also require them to accept the lowest responsible bid if any is accepted, they do not purport to set aside local price regulations or to prohibit the states from taking punitive measures for violations of such regulations. They are wholly consistent with the continued existence of such price regulations, and with the acceptance by government officers of the regulated price where that is the low-

---

[1] This provision was derived from § 10 of the Appropriation Act of Mar. 2, 1861, 12 Stat. 220, which in turn was a reënactment of § 3 of the Appropriation Act of June 23, 1860, 12 Stat. 103. Like the Act of March 2, 1901, R. S. § 3709 has been construed as inapplicable where competition is impracticable. 38 Op. Atty. Gen. 164, 174; 39 Op. Atty. Gen. 111; 17 Op. Atty. Gen. 84, 87.

est bid, or the omission of competitive bidding in circumstances where local price regulations render it "impracticable to secure competition." Nor are we able to discern, in the language or legislative history of these or related statutes regulating government contracts, any indication that low cost was such a controlling consideration with Congress as to justify an inference that Congress intended to displace state regulations affecting the price of articles purchased by the government. The reason for the passage of § 5 of the Act of March 3, 1809, has been said to be "to throw additional safeguards around this subject; to prevent favoritism, and to give to the United States the benefit of competition . . ." 2 Op. Atty. Gen. 257, 259.

We are not advised of any statute in which Congress has undertaken to set aside state laws affecting the price of goods supplied to the government in order to secure a lower price than would otherwise be obtainable. And Congress has often required the inclusion in government contracts of terms not directly related to the interests of the government as purchaser, which have the effect of increasing cost. Title III, § 2 of the Act of March 3, 1933, 47 Stat. 1520, 41 U. S. C. §§ 10 (a)–10 (c), requires the use of American-produced goods on all public works contracts unless the head of the department finds that the use of such materials is "impracticable" or would "unreasonably increase the cost." The Eight Hour Law of August 1, 1892, 27 Stat. 340, as amended, 40 U. S. C. §§ 321–326, limits to eight hours per day the work of persons employed by contractors with the government and requires all government contracts to include provisions to that effect. The Davis-Bacon Act of March 3, 1931, 46 Stat. 1494, as amended, 40 U. S. C. § 276 (a), requires all contracts for public buildings to contain prevailing minimum wage provisions, and the Walsh-Healey Act, 49 Stat. 2036, 41 U. S. C. § 35, requires the inclusion in all gov-

ernment contracts in excess of $10,000 of provisions requiring the contractor's adherence to prescribed minimum wages, maximum hours, restrictions on employment of child labor and requirements for safety of working conditions.[2]

Evidence is wanting that Congress, in authorizing competitive bidding, has been so concerned with securing the lowest possible price for articles furnished to the government that it wished to set aside all local regulations affecting price. On the contrary Congress has regarded the field of public contracts as one over which to exercise its supervisory legislative powers in safeguarding interests

---

[2] The Military Appropriation Act of 1941, 55 Stat. 372, requires the purchase of food and clothing produced in the United States unless none of satisfactory quality is available in sufficient quantity and at "reasonable prices." And successive Appropriation Acts materially restrict the use of appropriated funds by the Quartermaster Corps to purchase oleomargarine or butter substitutes. E. g. 49 Stat. 1285, 50 Stat. 449, 52 Stat. 649, 53 Stat. 600, 54 Stat. 358, 55 Stat. 372. See also R. S. § 3716, 10 U. S. C. § 1202 (preference to articles of domestic production "conditions of price and quality being equal").

The War Department, by Procurement Circular No. 4, February 9, 1938, and Procurement Circular No. 10, January 26, 1942, issued pursuant to Par. 5 (h) of AR 5–140, provided for the inclusion in Army contracts of provisions requiring the bidder to certify to his compliance with any applicable marketing agreement, license, or order, executed or issued by the Secretary of Agriculture pursuant to the Agricultural Marketing Agreement Act of 1937, 7 U. S. C. §§ 601 et seq. All Procurement Circulars have since been rescinded, see infra n. 3.

See also Executive Order No. 325–A, May 18, 1905 (convict labor), temporarily suspended by Executive Order No. 9196, July 9, 1942; Executive Orders Nos. 6246, Aug. 10, 1933, and 6646, March 14, 1934 (compliance with Codes of Fair Competition).

Despite the enactment of § 201 of the First War Powers Act, Dec. 18, 1941, 55 Stat. 839, empowering the President to authorize contracts to be entered into without regard to provisions of existing law, the Walsh-Healey Act, the Davis-Bacon Act, and the Eight Hour Law remain applicable to all government contracts, Executive Order No. 9001, Dec. 27, 1941.

which may conflict with the needs of the government viewed solely as purchaser. An unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous. Considerations which lead us not to favor repeal of statutes by implication, *United States* v. *Borden Co.*, 308 U. S. 188, 198–9; *United States* v. *Jackson,* 302 U. S. 628, 631; *Posadas* v. *National City Bank,* 296 U. S. 497, 503–5, should be at least as persuasive when the question is one of the nullification of state power by Congressional legislation.

Hence, in the absence of some evidence of an inflexible Congressional policy requiring government contracts to be awarded on the lowest bid despite noncompliance with state regulations otherwise applicable, we cannot say that the Pennsylvania milk regulation conflicts with Congressional legislation or policy and must be set aside merely because it increases the price of milk to the government. It would be no more than speculation for us to say that Congress would consider the government's pecuniary interest as a purchaser of milk more important than the interest asserted by Pennsylvania in the stabilization of her milk supply through control of price. Courts should guard against resolving these competing considerations of policy by imputing to Congress a decision which quite clearly it has not undertaken to make. Furthermore we should be slow to strike down legislation which the state concededly had power to enact, because of its asserted burden on the federal government. For the state is powerless to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the burden.

The government, in support of its position, points to Army Regulation 5–100, Paragraph 11d, which was in

effect at the time this contract was entered into and performed,[3] and which read as follows:

"State price-fixing laws.—Appropriated funds may not be used for payments under awards upon invitations for bids containing restrictive requirements of showing compliance with State price-fixing laws relating to services, commodities, or articles necessary to be purchased by the United States until there has been an authoritative and final judicial determination that such State statutes are applicable to such contracts. It is not the duty or responsibility of contracting officers of the Federal Government, by means of restrictive specifications, to enforce contractors to comply with the requirements of price-fixing acts of a State. See 16 Comp. Gen. 97, 348; 17 id. 287; 19 id. 614."

Two observations are to be made with respect to this regulation. The statutes authorizing the Secretary of War "to prescribe rules and regulations to be observed in the preparation and submission and opening of bids for contracts under the War Department," 20 Stat. 36, 22 Stat. 487, 5 U. S. C. § 218, give no hint of any delegation to the Secretary or his subordinates of power to do what Congress has failed to do—restrict the application of local regulations, otherwise applicable to government contractors, which increase price. And the regulation itself is at most a direction to contracting officers not to

---

[3] All of the Army Regulations and Procurement Circulars referred to in this opinion were rescinded on the adoption of War Department Procurement Regulations, effective July 1, 1942, Code of Federal Regulations, Title 10, § 81, 7 Fed. Reg. 8082. See Procurement Regulation 1, Pars. 102, 103. Paragraph 209 of Procurement Regulation 2—issued under the authority of § 201 of the First War Powers Act, December 18, 1941, 55 Stat. 839, and Executive Order No. 9001, December 27, 1941—provides that all contracts shall be placed by negotiation save where formal advertising is authorized by the Director of Purchases of the War Production Board.

assume by their specifications for bids any responsibility for requiring compliance with local price regulations before it is judicially determined whether such regulations are applicable to government contracts.

That such is the meaning of the regulation is made plain by reference to the opinions of the Comptroller General, cited in the regulation. All rest on the reasoning of *Panhandle Oil Co.* v. *Knox,* 277 U. S. 218, and like cases, which were overruled in *Alabama* v. *King & Boozer, supra.* The Comptroller General held that since the constitutional applicability of local price regulations to government contractors was doubtful, the right of the government to challenge their validity should not be foreclosed by contractual provisions, and that in the absence of a judicial determination of their applicability a bid which failed to comply with such price regulations could not for that reason be rejected.

When Paragraph 11d was adopted, Paragraph 4g of Army Regulation 5–240 defined the situations in which, because it was deemed "impracticable to secure competition," supplies might, under 10 U. S. C. § 1201, be purchased in the open market without advertising. Paragraph 4g (3) declared that such a situation arose "when the price is fixed by federal, state, municipal or other competent legal authority," a clear indication that state price regulations were not thought to be inapplicable to sales under Army contracts.[4]  After the present suit

---

[4] In a memorandum to the Undersecretary of War dated April 16, 1941, after the present litigation had been instituted, the Judge Advocate General expressed the opinion that in view of the apparent conflict between the terms of AR 5–240, Par. 4g (3) and AR 5–100, Par. 11d (at that time renumbered as Par. 11e), the former regulation applied only in exceptional situations and was not effective to make applicable to government contractors price-fixing regulations such as that here involved. The Judge Advocate General referred to the "consistent position" taken by the War Department "that price-fixing

was begun subparagraph 3 was eliminated. The only effect of this elimination was to remove the conflict of that paragraph with the "hands off policy" of the War Department adopted by Army Regulation 5–100, Paragraph 11d.

Even though it be assumed that the Secretary could by regulation set aside the state's price legislation which it has made applicable to government contractors, he plainly has not done so. He has left the question of its applicability to be settled by this Court's determination of the scope of the government's immunity under the laws and Constitution of the United States. In the meantime he has adopted a specific policy of not including, in government contracts, terms requiring the contractor's compliance with state price-fixing legislation, thus avoiding any action which could be construed as an assent to the application of such legislation to government contractors in circumstances, if any, where it would without affirmative assent be inapplicable.

We are unable to find in Congressional legislation, either as read in the light of its history or as construed by the executive officers charged with the exercise of the contracting power, any disclosure of a purpose to immunize government contractors from local price-fixing regulations which would otherwise be applicable. Nor, in the circumstances of this case, can we find that the Constitution, unaided by Congressional enactment, confers such an immunity. It follows that the Pennsylvania courts rightly held that the Constitution and laws of the United States did not preclude the application of the Pennsylvania Milk

---

measures of the states have no application to procurements by the War Department." But we do not understand from this or other memoranda of the Judge Advocate General that the position referred to is any broader than that expressed in Par. 11d of AR 5–100 and in the opinions of the Comptroller General to which that paragraph refers.

Control Law to appellant Penn Dairies, Inc., by denial of its license application.

*Affirmed.*

MR. JUSTICE RUTLEDGE took no part in the consideration or decision of this case.

MR. JUSTICE MURPHY, concurring:

I agree with the opinion of the Court that neither Congressional legislation nor the implications of the Constitution prevent the application of the minimum price requirements of the Pennsylvania Milk Control Law to the sale of milk by a dealer to the United States, but wish to emphasize a phase of the question which I believe is most important.

We are not concerned here with just an ordinary state regulatory statute of non-discriminatory character which affects the federal government in some degree, but with a general measure designed to safeguard the health and well-being of the public by insuring an adequate supply of wholesome milk at stable prices.[1] The preservation of public health is a matter of grave and primary concern to the states and the nation at all times, but even more so in time of war. Then indeed a healthy citizenry is essential to national survival, for the waging of modern "total war," if it is to be done with maximum effectiveness, requires a sound and healthy people, as well as a sturdy fighting force.

---

[1] Section 101 of the Pennsylvania law declares that the milk industry "is a business affecting the public health and affected with a public interest," and that the purpose of the Act is to regulate and control the industry "for the protection of the public health and welfare and for the prevention of fraud." Section 801 requires the Milk Control Commission to ascertain and maintain such prices for milk "as will be most beneficial to the public interest, best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to inhabitants of the Commonwealth, having special regard to the health and welfare of children residing therein."

In this country with its heterogeneous population living under diverse conditions in widely separated areas, state and local authorities are best qualified to determine what measures are most appropriate and necessary to promote the health and well-being of the people within their borders, and they should be given the widest possible latitude to solve their special problems as they think best. The whole framework of our federal system is based upon this principle. It has contributed to our strength and solidarity as one people. It should be the aim of all federal procurement officers, military or civilian, to harmonize their work so far as possible with this broad policy of government. Such an aim is in accord with the spirit of our laws and the character of our institutions and will best insure whole-hearted support of the military program.

In my opinion it is of greater importance to the nation at war and to its military establishment that high standards of public health be maintained than that the military procurement authorities have the benefit of unrestrained competitive bidding and lower prices in the purchase of needed milk supplies. That the United States must pay 1.6¢ more per quart for milk in Pennsylvania hardly means the collapse of the war effort. But it is common knowledge that armies frequently suffer more from the ravages of disease and sickness than from the perils of combat, and, if milk vendors dealing with the United States need not comply with Pennsylvania's minimum price requirements, the effectiveness of Pennsylvania's law is considerably reduced for it is conceded that the instant order is the largest single one ever given for milk within the State. This reduced effectiveness may have serious and unwanted repercussions not only upon civilian health but that of the military personnel stationed there as well.

In the conduct of the war as well as in other relations, the larger interests of the federal government and the

nation as a whole will not suffer, nor will constitutional arrangements be prejudiced, if procurement officers are obliged to conduct their activities within the general framework of state laws enacted within reasonable limits to safeguard the public health, and safety. If Alabama for the purpose of revenue can, consistently with the Constitution, require government contractors to pay sales and use taxes upon materials used in a cost plus a fixed fee construction contract, the effect of which is to increase the cost of construction to the federal government (*Alabama* v. *King & Boozer*, 314 U. S. 1; *Curry* v. *United States*, 314 U. S. 14), there is all the more reason why Pennsylvania, acting to protect the public health, can require, until Congress makes clear its wishes otherwise, a dealer selling milk to the United States to adhere to its minimum price requirements. This is not to say that the States may exercise direct control over the actions of federal officials, military or otherwise, or that Congress may not invalidate or suspend local regulations insofar as they affect transactions with the federal authorities. If Congress determines that the enforcement of the Pennsylvania law against dealers selling to the United States interferes with its power to wage war, and forbids its application to them, we have a different question. See *Federal Land Bank* v. *Bismarck Co.*, 314 U. S. 95. As yet it has not done so, and in the absence of such a measure, I can perceive no necessity or adequate justification either in law or constitutional theory for holding Pennsylvania's regulation void as applied here.

MR. JUSTICE DOUGLAS, dissenting:

The contract with Penn Dairies was made by the War Department acting through the Quartermaster of the Army. The Quartermaster Corps, one of the statutory branches of the Regular Army (41 Stat. 759, 10 U. S. C. § 4) is charged "under the authority of the Secretary of

War" with the "purchase and procurement for the Army of all supplies of standard manufacture and of all supplies common to two or more branches" of the Army, with exceptions not material here. 39 Stat. 170, 41 Stat. 766, 10 U. S. C. § 72. The procedure which controls purchases of supplies by the Quartermaster Corps is governed by the statutes and by the Army Regulations. There are statutory requirements for competitive bidding as respects the purchase of "all supplies" [1] and with particular reference to supplies purchased "for immediate use." [2] The only exception relevant here is the case "where it is impracticable to secure competition." 10 U. S. C. § 1201. The policy is plain—it is intended that the United States should get the full benefit of price competition in its

---

[1] "Except in cases of emergency or where it is impracticable to secure competition, or in cases otherwise provided for, the purchase of all supplies for the use of the various departments, and posts of the Army and of the branches of the Army service shall only be made after advertisement; and said supplies shall be purchased where the same can be purchased the cheapest, quality and cost of transportation and the interests of the Government considered." 31 Stat. 905, 32 Stat. 514, 10 U. S. C. § 1201. And see R. S. § 3709, 41 U. S. C. § 5.

[2] "All purchases of regular and miscellaneous supplies for the Army furnished by the Quartermaster Corps for immediate use shall be made by the officers of such corps, under direction of the Secretary of War, at the places nearest the points where they are needed, the conditions of cost and quality being equal: *Provided*, That all purchases of said supplies, except in cases otherwise provided for, and except in cases of emergency, which must be at once reported to the Secretary of War for his approval, shall be made by contract after public notice of not less than ten days for small amounts for immediate use, and of not less than from thirty to sixty days whenever, in the opinion of the Secretary of War, the circumstances of the case and conditions of the service shall warrant such extension of time. The award in every case shall be made to the lowest responsible bidder for the best and most suitable article, the right being reserved to reject any and all bids." 23 Stat. 109, 37 Stat. 591, 10 U. S. C. § 1200.

purchases of Army supplies. See *United States* v. *Purcell Envelope Co.*, 249 U. S. 313, 318.

Statutory authority is vested in the Secretary of War to prescribe rules and regulations covering the preparation, submission, and opening of bids "for contracts under the War Department." 20 Stat. 36, 22 Stat. 487, 5 U. S. C. § 218. The Secretary pursuant to this authority has issued numerous regulations governing competitive bidding. Regulation No. 5–100, Par. 11d, August 7, 1940, specifically prohibits use of appropriated funds for payments under contracts containing prices fixed by state law "until there has been an authoritative and final judicial determination that such State statutes are applicable to such contracts."[3] The policy of the War Department has been well established. The Judge Advocate General stated in April 1941 that "the War Department has consistently taken and maintained the position that price-fixing measures of the states have no application to procurements by the War Department." Whatever ambiguity may have existed in other regulations has been removed.[4]

---

[3] This Regulation reads as follows: "Appropriated funds may not be used for payments under awards upon invitations for bids containing restrictive requirements of showing compliance with State price-fixing laws relating to services, commodities, or articles necessary to be purchased by the United States until there has been an authoritative and final judicial determination that such State statutes are applicable to such contracts. It is not the duty or responsibility of contracting officers of the Federal Government, by means of restrictive specifications, to enforce contractors to comply with the requirements of price-fixing acts of a State."

[4] Army Reg. No. 5–240, February 11, 1936, as amended July 6, 1938, provided in paragraph (4) (g) (3) that "purchase may be made in the open market without competition" when the "price is fixed by Federal, State, municipal, or other competent legal authority." It should be noted that this was a permissive and not a mandatory requirement. On May 10, 1941, paragraph (4) (g) was amended so as to omit any reference to governmental price fixing.

284

We have then regulations of the War Department made pursuant to powers delegated by Congress and which prohibit the Army's contracting officers from waiving competitive bidding merely because prices are fixed by the states. I am unable to see why they are not valid regulations. Congress has said that competitive bidding "shall" be required except where it is "impracticable to secure competition." 10 U. S. C. § 1201. The word "impracticable" does not suggest that wherever there is state price-fixing competitive bidding is not required. A thing is "impracticable" to do when it is infeasible or incapable of being done. The contract which the Quartermaster made with Penn Dairies is conclusive of the fact that it was not "impracticable" to obtain the milk through competitive bidding. A regulation which interprets "impracticable" so as not to preclude competitive bidding because of state price-fixing stays well within the scope of the rule making power. These War Department regulations accordingly "have the force of law." *Standard Oil Co.* v. *Johnson,* 316 U. S. 481, 484, and cases cited. Their application in this case therefore has no less force and effect than if it was specifically directed by Congress. We have then an assertion of federal power in the field of price control which by reason of the supremacy clause excludes any exercise of a conflicting state power. See *Sinnot* v. *Davenport,* 22 How. 227; *McDermott* v. *Wisconsin,* 228 U. S. 115; *Pennsylvania R. Co.* v. *Illinois Brick Co.,* 297 U. S. 447; *Hines* v. *Davidowitz,* 312 U. S. 52; *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148.

MR. JUSTICE BLACK and MR. JUSTICE JACKSON join in this dissent.