UNITED STATES of America,
Appellant,

v.

STATE OF NORTH DAKOTA, Robert
E. Hanson, State Treasurer of North
Dakota, Appellees.

No. 87–5334.

United States Court of Appeals,
Eighth Circuit.

Submitted May 10, 1988.

Decided Sept. 9, 1988.

Raymond Hepper, Washington, D.C., for appellant.

Nicholas J. Spaeth, Bismarck, N.D., for appellees.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

HENLEY, Senior Circuit Judge.

In this appeal we must pass upon the constitutionality of North Dakota's attempts to regulate the military's purchase of alcoholic liquor from out-of-state suppliers. The State's regulations require out-of-state suppliers to affix a label to each bottle of liquor destined for a military installation in North Dakota stating that the liquor is exclusively for consumption within the federal military enclave. In addition, each supplier must file a monthly report showing the quantity of liquor shipped into the State during the preceding month.[1] While this is a case in which the parties may appear simply to bicker over liquor stickers, it implicates important constitutional considerations.

The United States brought this suit against the State of North Dakota for a declaration that the State's regulations are unconstitutional and for an injunction against their enforcement. The position of the United States is essentially that the regulations conflict with a federal regulation requiring the military to procure liquor under the most advantageous contract, and are therefore invalid under the supremacy clause of the United States Constitution. North Dakota responds that the twenty-first amendment, which forbids the importation of alcohol into a state in violation of the laws of that state, gives it the power to regulate the importation of liquor to military bases in order to control its unlawful diversion into the state's domestic commerce.

The case was presented to the district court on cross motions for summary judgment. The parties stipulated that the military bases in North Dakota are not exclusive federal jurisdiction enclaves.[2]

The outlets for alcoholic beverages on the military installations in North Dakota are clubs and package goods stores denominated non-appropriated fund instrumentalities (NFIs) of the federal government. NFIs are not directly supported with government funds. They exist for the purpose of generating profits to support military recreational activities. They accomplish this largely through the sale of alcoholic beverages to active and retired military personnel and their families. A regulation of the Department of Defense provides that the Department shall cooperate with local authorities but that "the purchase of all alcoholic beverages for resale [at military facilities] ... shall be in such a manner and under such conditions as shall obtain for the government the most advantageous contract, price and other considered factors." 32 C.F.R. § 261.4 (1986).

---

1. North Dakota Admin.Code § 84–02–01–05(1) provides:

    All persons sending or bringing liquor into North Dakota shall file a North Dakota schedule A report of all shipments and returns for each calendar month with the state treasurer. The report must be postmarked on or before the fifteenth day of the following month.

    North Dakota Admin.Code § 84–02–01–05(7) provides:

    All liquor destined for delivery to a federal enclave in North Dakota for domestic consumption and not transported through a licensed North Dakota wholesaler for delivery to such bona fide federal enclave in North Dakota shall have clearly identified on each individual item that such shall be for consumption within the federal enclave exclusively. Such identification must be in a form and manner prescribed and approved by the state treasurer.

2. The parties offered no evidence regarding the extent of the jurisdiction vested in the State. The court reasoned that it need not address the issue of jurisdiction inasmuch as the State is not attempting to regulate alcohol consumption within the federal enclave. *United States v. North Dakota*, 675 F.Supp. 555, 558 (D.N.D. 1987). However, the State does attempt to regulate the *transaction* between the distillers and the military: "the delivery, storage and sale—of the liquor occur[ ] exclusively within the [bases]." *United States v. State Tax Comm'n of Mississippi*, 412 U.S. 363, 377, 93 S.Ct. 2183, 2192, 37 L.Ed.2d 1 (1973) (discussing *Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938)).

The regulation further provides that neither cooperation with local authorities nor the "other factors" bearing on the most advantageous contract shall be construed as requiring submission to state control, taxation, or requirements that alcoholic beverages be purchased from in-state suppliers. *Id.*

The trial court record shows that, in response to the State's regulations, one out-of-state supplier informed the Air Force that it would impose price increases ranging from $.85 to $20.50 per case. Five other suppliers refused to sell to military facilities in North Dakota. According to an affidavit from Robert Hanson, the State Treasurer, other suppliers, although we are not told how many, are willing to comply with the regulations.

The United States submitted an affidavit from Kim Keltz, the manager of the joint military service consolidated purchasing program for distilled spirits, stating that if the military is forced to purchase its distilled spirits requirements from local wholesalers, its costs would rise approximately $200,000.00 to $250,000.00 annually.[3] Mr. Hanson's affidavit stated that the labels were necessary to control diversion, and that he was "aware of the diversion of alcoholic beverages from North Dakota federal enclaves into the state's domestic commerce in contravention of the state's established liquor distribution system."

The district judge reasoned that, although the regulations may have indirectly caused an increase in the military's liquor costs, they did not conflict with the regulations requiring the most advantageous contract. Rather, they merely made the most advantageous contract more expensive. *United States v. North Dakota,* 675 F.Supp. 555, 557 (D.N.D.1987). The court went on to hold that, assuming a conflict between the State and federal interests, the State would prevail, as its interests in regulating the importation of liquor under the twenty-first amendment outweigh those of the government in procuring liquor at the lowest possible price. *Id.* at 558-59. Accordingly, the court granted the State's motion for summary judgment, and denied the summary judgment motion of the United States. The United States appeals. For the reasons that follow, we reverse.

■ Section 2 of the twenty-first amendment provides: "The transportation or importation into any State ... for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." The "core power" conferred on the states in § 2 is "that of exercising 'control over whether to permit importation or sale of liquor and how to structure the liquor distribution system.'" *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 713, 715, 104 S.Ct. 2694, 2704, 81 L.Ed.2d 580 (1984) (quoting *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 110, 100 S.Ct. 937, 945-46, 63 L.Ed.2d 233 (1980)). While the principal effect of § 2 is to free the states from the normal constraints imposed by the commerce clause, this freedom is not without limits, *Craig v. Boren,* 429 U.S. 190, 207, 97 S.Ct. 451, 462, 50 L.Ed.2d 397 (1976); *South Dakota v. Dole,* 791 F.2d 628, 633 (8th Cir.1986), *aff'd,* — U.S. —, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), since the twenty-first amendment does not give the states the exclusive power to regulate liquor. *Dole,* 791 F.2d at 633. Determining the precise contours of state and federal power in this area is not necessarily a simple task, however. *South Dakota v. Dole,* — U.S. —, 107 S.Ct. 2793, 2795, 97 L.Ed.2d 171 (1987) (bounds of the amendment "have escaped precise definition"); *Midcal Aluminum,* 445 U.S. at 110, 100 S.Ct. at 946 ("no bright line between state and federal powers over liquor"). In this case, we must decide whether State power extends so far as to enable the State here to regulate instrumentalities of the United States over which the State exercises concurrent jurisdiction.[4]

3. *See infra* note 9.

4. The state's broad power to regulate alcoholic beverages rests largely on its greater power to absolutely prohibit them within its boundaries. *Ziffrin, Inc. v. Reeves,* 308 U.S. 132, 138, 60 S.Ct. 163, 166-67, 84 L.Ed. 128 (1939). But in cases of dual sovereignty over the same territory, one

The ability of a state to regulate liquor purchases by the military was the subject of two related Supreme Court decisions, *United States v. State Tax Commission of Mississippi,* 412 U.S. 363, 93 S.Ct. 2183, 37 L.Ed.2d 1 (1973) ("Tax Commission I") and *United States v. State Tax Commission of Mississippi,* 421 U.S. 599, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975) ("Tax Commission II"). The Mississippi Tax Commission had promulgated a regulation requiring distillers to collect a "wholesale markup," which the Court determined was a tax, from military purchasers. The Court held that, the twenty-first amendment notwithstanding, Art. I, § 8, cl. 17, of the Constitution [5] prohibited the state from regulating in any manner transactions occurring on those bases over which the military exercised exclusive jurisdiction. 412 U.S. at 369–71, 375, 93 S.Ct. at 2190–91. The Court rested its analysis on the language of the twenty-first amendment forbidding the unlawful "importation into any state," observing that an exclusively federal enclave is not within any state's territory. *Id.* at 375, 93 S.Ct. at 2190–91.

As noted, the parties to this case stipulate that the bases in North Dakota are not under exclusive federal jurisdiction, and the United States makes no argument for the application of Art. I, § 8, cl. 17. In *Tax Commission I,* however, the Court was faced also with determining the validity of state regulation in the context of concurrent state and federal jurisdiction over military installations. That issue was the subject of a remand and a subsequent appeal to the Supreme Court. In *Tax Commission II,* the United States attacked the state tax on the ground that it violated the principle, first set forth in *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), that the national government

enjoys immunity from state taxation by virtue of the supremacy clause.[6] 421 U.S. at 612–13, 95 S.Ct. at 1880–81. The Court agreed, citing *Department of Revenue v. James B. Beam Distilling Co.,* 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964), and *Hostetter v. Idlewild Bon Voyage Liquor Corp.,* 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964). In *James Beam,* the Court had invalidated Kentucky's tax on the import of whiskey from Scotland on the ground that the tax violated the Export–Import Clause, Art. I § 10, cl. 2, and held that the twenty-first amendment had not repealed that clause. In *Hostetter* the Court held that the twenty-first amendment did not override the commerce clause to the extent that New York could prohibit the sale of liquor, under United States Customs supervision, to airline passengers departing for other countries. The Court concluded that "[s]imilarly, it is a 'patently bizarre' and 'extraordinary conclusion' to suggest that the Twenty-First Amendment abolished federal immunity as respects taxes on sales to bases where the United States and Mississippi exercise concurrent jurisdiction...." 421 U.S. at 614, 95 S.Ct. at 1881 (quoting *Hostetter,* 377 U.S. at 332, 84 S.Ct. at 1298, *James Beam,* 377 U.S. at 345, 84 S.Ct. at 1249–50).

The United States argues that the *Tax Commission II* holding does more than merely prohibit state taxation of the NFIs; rather, it argues that the Court found all state regulation of liquor imports into concurrent jurisdiction installations prohibited. The United States quotes the following passage:

When the case was last here we held that "the Twenty-First Amendment confers no power on a State to regulate—whether by licensing, taxation, or otherwise—the importation of distilled spirits into

---

sovereign may not normally prohibit what the other permits. *Nielsen v. Oregon,* 212 U.S. 315, 321, 29 S.Ct. 383, 384–85, 53 L.Ed. 528 (1909). Thus, even putting aside supremacy clause considerations, which we take up *infra,* it is questionable whether a state could prohibit the importation of alcohol into military bases when its "co-sovereign," the United States, permits it, and the lesser power to regulate is correspondingly drawn into some doubt.

**5.** Art. I, § 8, cl. 17, empowers Congress to "exercise exclusive Legislation ... over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

**6.** U.S. Const. art VI, cl. 2.

territory over which the United States exercises exclusive jurisdiction [pursuant to Art. I, § 8, cl. 17, of the Constitution]." 412 U.S., at 375 [93 S.Ct. at 2190–91]; *see Collins v. Yosemite Park & Curry Co.,* 304 U.S. 518, 538 [58 S.Ct. 1009, 1018–19, 82 L.Ed. 1502] (1938). Cf. *James v. Dravo Contracting Co.,* 302 U.S. 134, 140 [58 S.Ct. 208, 212, 82 L.Ed. 155] (1937). We reach the same conclusion as to the concurrent jurisdiction bases to which Art. I, § 8, cl. 17, does not apply. . . .

421 U.S. at 613, 95 S.Ct. at 1880–81. The sentence does not end there, however. Following a colon, the Court continues: "Nothing in the language of the Twenty-First Amendment nor in its history leads to the extraordinary conclusion that the Amendment abolished federal immunity with respect to *taxes* on sales of liquor to the military on bases where the United States and Mississippi exercise concurrent jurisdiction." *Id.* at 614–15, 95 S.Ct. at 1881 (emphasis added, internal quotations and brackets omitted). This latter expression might be taken to modify "same conclusion" to mean that, with respect to taxation, the result is the same. On the other hand, the opinion may be read to apply the "same conclusion" terminology to a state's power *"to regulate*—whether by licensing, taxation, *or otherwise." Id.* at 613, 95 S.Ct. at 1880 (emphasis added). While engaging in a semantic exercise is interesting, we think it wise as well to explore to some extent the policies underlying the supremacy clause, since that is where the Supreme Court rested its decision.

The Supreme Court has explained the operation of the supremacy clause in the following terms:

Since the United States is a government of delegated powers, none of which may be exercised throughout the Nation by any one state, it is necessary for uniformity that the laws of the United States be dominant over those of any state. Such dominancy is required also to avoid a breakdown of administration through possible conflicts arising from inconsistent requirements. The supremacy clause of the Constitution states

this essential principle. Article VI. *A corollary to this principle is that the activities of the Federal Government are free from regulation by any state.* No other adjustment of competing enactments or legal principles is possible.

*Mayo v. United States,* 319 U.S. 441, 445, 63 S.Ct. 1137, 1139–40, 87 L.Ed. 1504 (1943) (footnote omitted) (emphasis added). It appears that this "corollary principle" is the underlying rationale for the Court's decision in *Tax Commission II,* and that it applies with as much force to the question of regulation as it does to taxation. This conclusion is bolstered by the Court's reliance on *McCulloch v. Maryland,* 17 U.S. (4 Wheat) 316, 4 L.Ed. 579, in both *Mayo,* 319 U.S. at 445 n. 5, 63 S.Ct. at 1139 n. 5, and *Tax Commission II,* 421 U.S. at 612–13, 95 S.Ct. at 1880–81. The need for uniformity underlying the supremacy clause cited in *Mayo* is as great, if not greater, with respect to the power to regulate as it is concerning the power to tax instrumentalities of the federal government.

The State correctly points out that federal interests generally may give way to weightier state interests when the state exercises its core power under the twenty-first amendment. *Crisp,* 467 U.S. at 713, 104 S.Ct. at 2707–08. That may be so when a private party, for example, asserts a constitutional or federally-created right or interest against the state's use of its twenty-first amendment power, but the *Tax Commission II* decision teaches that the state's "virtually unlimited" authority reaches its limits when the state attempts to exercise that power over an instrumentality of the federal government itself. This principle is inherent in the nature of the federal system: the sovereignty of a state does not extend to the means by which Congress executes the powers conferred upon it. *McCulloch,* 17 U.S. (4 Wheat) at 428; *see Mayo,* 319 U.S. at 445, 63 S.Ct. at 1139–40. The essential function of § 2 of the twenty-first amendment, to free the states from the normal operation of the commerce clause, does not justify abrogating these longstanding principles. *United States v. Texas,* 695 F.2d 136, 139 (5th Cir.) (twenty-

first amendment does not touch upon federal concerns beyond the commerce clause), *cert. denied,* 464 U.S. 933, 104 S.Ct. 336, 78 L.Ed.2d 305 (1983); *see also Craig,* 429 U.S. at 206, 97 S.Ct. at 461–62 (relevance of amendment to other constitutional provisions doubtful once passing beyond consideration of commerce clause).

In this case, Congress has acted pursuant to its constitutional prerogative to "raise and support armies," to "provide and maintain a Navy," and "to regulate the land and naval Forces." U.S. Const. art. I, § 8. Congress has provided that "alcoholic beverage purchases made for resale on a military installation located in the United States shall be made from the most competitive source, price and other factors considered." 10 U.S.C. § 2488(a)(1).[7] In enacting this legislation, Congress considered, but rejected, a requirement that the military procure all its liquor from sources within the state where the installation on which the liquor is to be sold is located.[8] Sen.Rep. No. 93–331, 99th Cong., 2d Sess. 283, *reprinted in* 1986 U.S. Code Cong. & Admin.News 6413, 6476. The Senate Report explains,

> The committee continues to object to such a requirement and has included a provision mandating that purchases of such alcoholic beverages for resale be made in the most efficient and economic manner, without regard to the location of the source of the beverages, except as that location may affect cost.... [T]he committee believes that procurement of alcoholic beverage for resale should be subjected to the same favorable effects of competition as is useful in the procurement of other goods and services. Additionally, the committee does not believe it appropriate to impose upon the Department, or the morale and welfare activities of the Department a requirement which will result in additional costs of tens of millions of dollars, caused by the imposition of indirect State taxation in

[sic] the Federal government and the lack of competition.

*Id.*

■ Moreover, the history of military alcohol procurement reflects a longstanding policy of purchasing alcoholic beverages at the lowest available price and using the proceeds for the benefit of the welfare and morale of military personnel and their families. *United States v. South Carolina,* 578 F.Supp. 549, 553 (D.S.C.1983); Comment, *Pre-empting State Action Taken Pursuant to the Twenty–First Amendment,* 53 Temp.L.Q. 590, 600 (1980). Another aspect of the federal scheme worth noting is that recreational activities need not be supported by the federal government through appropriated funds so long as the NFIs are able to provide sufficient revenue. *Falls City Brewing Co. v. Reeves,* 40 F.Supp. 35, 39–40 (W.D.Ky. 1941); 132 Cong.Rec. S10936, 10940 (daily ed. Aug. 9, 1986) (statement of Sen. Goldwater). We conclude that the twenty-first amendment provides no basis for regulating the means by which Congress has sought to order military liquor procurement and to provide for the welfare and morale activities of military personnel. *See McCulloch,* 17 U.S. (4 Wheat) at 428. Moreover, we incline to the view that *Tax Commission II* precludes state regulation notwithstanding the State's concurrent jurisdiction over the bases. *United States v. Texas,* 695 F.2d at 140 n. 8; *Rehner v. Rice,* 678 F.2d 1340, 1350 (9th Cir.1982), *rev'd on other grounds,* 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983).

■ Even assuming that the twenty-first amendment extends jurisdiction over the subject matter, *see United States v. Texas,* 695 F.2d at 138, we find that the balancing of state and federal interests would lead us to conclude that the State's regulations are pre-empted by federal law. The four primary considerations in weighing the state and federal interests are: "(1) the perva-

---

7. Beer and wine purchases are excluded from this requirement. 10 U.S.C. § 2488(a)(2).

8. The amendment was proposed and co-sponsored by Senator Andrews of North Dakota, a

fact from which we draw no inferences. 132 Cong.Rec. S10936–37 (daily ed. Aug. 9, 1986) (Statement of Sen. Andrews).

siveness of the federal regulatory scheme, (2) whether federal occupation of the field is necessitated by a need for national uniformity, (3) the danger of conflict between state laws and the administration of federal programs, and (4) whether the state regulation infringes upon individual constitutional guarantees...." *Id.* at 138–39 (citing *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941); *Pennsylvania v. Nelson,* 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956)). The first three of these considerations are relevant here.

The first factor, the pervasiveness of the federal program, is essentially a vehicle for determining congressional intent to occupy the field. *See Pennsylvania v. Nelson,* 350 U.S. at 502–04, 76 S.Ct. at 480–81. Although regulations alone do not control, we must consider whether the regulations promulgated by an agency entrusted to carry out the congressional purpose express a desire to completely occupy the field. *R.J. Reynolds Tobacco Co. v. Durham County, North Carolina,* 479 U.S. 130, 149, 107 S.Ct. 499, 511, 93 L.Ed.2d 449 (1986). Here, the Department of Defense regulation specifically prohibits the military from submitting to local control over liquor procurement. 32 C.F.R. § 261.4. The second factor, the need for uniformity, also weighs in favor of the United States. Given the national scale and characteristics of the military, "Congress might validly conclude that such uniformity is desirable." *Hines,* 312 U.S. at 73, 61 S.Ct. at 407. An "integrated and all embracing system" for providing welfare and morale activities to military personnel appears to have been the congressional goal in enacting § 2488. *Id.* at 74, 61 S.Ct. at 407–08.

The third consideration, the danger of conflict between state law and the federal program, is perhaps the most decisive in this case. "Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43 [83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248] (1963), or when state law 'stands as an obstacle to the accomplishment and execution of the full objectives and purposes of Congress,' *Hines v. Davidowitz, supra* 312 U.S. at 67 [61 S.Ct. at 404]." *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed. 2d 714 (1985). The State's regulations fail at least the latter test.

Because Congress has mandated that the military procure liquor on a competitive basis in order to maximize profits for the support of welfare and morale activities, we find that the State's regulations are in conflict with federal policy. The State does not dispute the military's projection of an annual increase in its annual liquor bill of $200,000.00–250,000.00 [9]. This increase results directly from the effect that the State's regulations have in making out-of-state distillers less competitive with local wholesalers. Although nothing in the record compels us to believe that the regulations are a pretext to require in-state purchases, the effect in large part is to require the military to make purchases within the State—purchases that would not otherwise be competitive with out-of-state sources. As we have seen, this result conflicts with Congress' desire for open competition designed to maximize revenue for

---

**9.** We are somewhat troubled by the lack of evidence in the record regarding how much of its distilled spirits the military will have to buy from sources in North Dakota. The affidavit of Mr. Hanson, the State Treasurer, states that some distillers did not object to the regulations and would continue to supply the military. The United States does not explain why it will have to purchase all of its liquor in-state, and thereby incur the $200,000.00–250,000.00 figure, if these sources are still available. Nor can we tell what percentage of the military's suppliers have either increased their prices or refused to deal. However, the State makes no argument on this point, and seems to acquiesce in the assertions of the United States. Moreover, the loss of six suppliers will have a significant financial impact in requiring the military to buy at least a substantial portion of its distilled spirits from within North Dakota, which it would otherwise have bought elsewhere.

welfare and morale activities.[10]

■ Quite apart from the twenty-first amendment, the state has always had the right pursuant to its police power to take reasonable measures to prevent the unlawful diversion of liquor into its stream of commerce. *Tax Commission I,* 412 U.S. at 377, 93 S.Ct. at 2191–92; *Carter v. Virginia,* 321 U.S. 131, 137–38, 64 S.Ct. 464, 468–69, 88 L.Ed. 605 (1944); *Duckworth v. Arkansas,* 314 U.S. 390, 393–97, 62 S.Ct. 311, 312–15, 86 L.Ed. 294 (1941). But the State's regulations are subject to the same pre-emption analysis we have undertaken with respect to the twenty-first amendment. *Tax Commission I,* 412 U.S. at 377, 93 S.Ct. at 2191–92 (state's regulation of unlawful diversion may not conflict with any act of Congress or federal regulation); *Duckworth,* 314 U.S. at 396, 62 S.Ct. at 314. For the same reasons, the State's regulations must fail.[11]

We do note, however, that much of the foregoing analysis turns upon the federal interest in a uniform system of liquor procurement and attendant revenue for recreational activities. We do not discern any desire or intent on the part of Congress or the Department of Defense to completely displace the State's traditional power to regulate unlawful diversion of liquor in transit to the bases so long as the State

does not trench upon the federal interests we have identified. Such regulation must not extend beyond what is reasonably necessary to protect the State's interest in preventing unlawful diversion. *Duckworth,* 314 U.S. at 396, 62 S.Ct. at 314. We need not here decide precisely how the State might legitimately further its interests. Rather than litigate *seriatim* every conceivable measure to combat unlawful diversion, it would be advisable for the parties, perhaps in conjunction with the distillers and other state governments, to negotiate a solution to the diversion problem by which all can abide.

In closing we also note that nothing in this opinion is meant to detract from the right of the State "to regulate or restrict, under § 2 of the Twenty-first amendment, the transportation off the ... bases of liquor that has been purchased and is in fact destined for use, distribution, or consumption within its borders." *Tax Commission I,* 412 U.S. at 378, 93 S.Ct. at 2192 (internal quotation omitted).

For the foregoing reasons, the district court's orders granting summary judgment to the State of North Dakota and denying the motion for summary judgment by the United States are reversed.

LAY, Chief Judge, dissenting.

---

**10.** North Dakota argues that the out-of-state distillers who refuse to sell to the military because of the regulations have expressed a preference for dealing with the military through their normal distribution channels, and that the regulations are merely an excuse to cease dealing with the military directly. In the absence of any evidence to the contrary, however, we presume that the distillers' motives are based on ordinary business decisions that legitimately reflect the economic realities of complying with North Dakota's regulatory scheme.

**11.** North Dakota cites *Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania,* 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748 (1943), for the proposition that the federal immunity does not extend to those who contract to supply goods or services to the federal government. In *Penn,* the Court found nothing to indicate that Congress intended to override local regulation increasing the cost of milk to the federal government. *Id.* at 273–75, 63 S.Ct. at 622–24. However, the Court subsequently came to a different result when faced with a regulation which, un-

like the regulation in *Penn,* made no allowances for state minimum price laws. *Paul v. United States,* 371 U.S. 245, 254–61, 83 S.Ct. 426, 432–36, 9 L.Ed.2d 292 (1963). The same result attaches here. Nor are we convinced by the State's argument that *Paul* admits of a different analysis for NFIs. *Paul* held that California's pricefixing scheme for milk could not be applied to military purchases from appropriated funds, which by federal statute were subject to a competitive bidding process. *Id.* at 262, 83 S.Ct. at 436–37. The Court remanded the case for a determination of whether California had jurisdiction to regulate purchases from non-appropriated funds, to which the statute did not apply. *Id.* at 270, 83 S.Ct. at 440–41. Here, the federal statutes and regulations expressly apply to nonappropriated funds and preclude submission to State control. Furthermore, unlike North Dakota's regulations, California's basic regulatory scheme may have existed at the time the federal government acquired jurisdiction, which is significant for reasons we need not delve into here. *See id.* at 268–69, 83 S.Ct. at 439–40.

I respectfully dissent.

There is no question that the state regulation requiring labels on all bottles sold by out-of-state liquor distributors directly to federal enclaves in the State of North Dakota was not conceived to be, nor does it have the effect of, a tax on the federal government. Furthermore, the regulation involved is not an attempt to regulate liquor consumption on a federal enclave. This regulation is exclusively intended to prohibit the diversion of this liquor into the state's domestic commerce.

It should be clear that *Tax Commission I and II*[1] relied upon by the majority are distinguishable from the present situation. In holding that the twenty-first amendment does not provide state authorization to require labeling to prevent diversion of liquor sales within the state, the majority slights the statement of the Supreme Court in *Tax Commission I:*

> This is not to suggest that the State is without authority either to regulate liquor shipments destined for the bases while such shipments are passing through Mississippi or to regulate the transportation of liquor off the bases and into Mississippi for consumption there. Thus, while it may be true that the mere "shipment [of liquor] through a state is not transportation or importation into the state within the meaning of the [Twenty-first] Amendment," *Carter v. Virginia*, 321 U.S. 131, 137 [64 S.Ct. 464, 468, 88 L.Ed. 605] (1944), a State may, in the absence of conflicting federal regulation,

properly exercise its police powers to regulate and control such shipments during their passage through its territory insofar as necessary to prevent the "unlawful diversion" of liquor "into the internal commerce of the State," see *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S., at 333, 331 n. 10 [84 S.Ct. at 1299, 1297 n. 10]; *Carter v. Virginia, supra; Duckworth v. Arkansas*, 314 U.S. 390 [62 S.Ct. 311, 86 L.Ed. 294] (1941).

*Tax Commission I*, 412 U.S. at 377–78, 93 S.Ct. at 2191–93. The Supreme Court thus clearly observed that the twenty-first amendment provides states with the authority to prohibit diversion of liquor that is imported to federal enclaves located within its boundaries.

There is no conflicting federal regulation or statute which requires the finding of federal preemption. The controlling statute which allegedly supersedes the earlier regulation simply states that the government must purchase liquor for military installations "from the most competitive source, price and other factors considered * * *." 10 U.S.C. § 2488(a)(1) (Supp. IV 1986). To urge federal preemption of this state regulation, which the majority concedes was passed in good faith to prevent diversion of out-of-state sales to military installations, by reason of this federal statute is to eradicate any real meaning to the core provisions of the twenty-first amendment.[2] By virtue of this amendment, "a State is totally unconfined by traditional

---

1. *United States v. State Tax Comm'n of Mississippi*, 412 U.S. 363, 93 S.Ct. 2183, 37 L.Ed.2d 1 (1973) ("Tax Commission I") and *United States v. Tax Comm'n of Mississippi*, 421 U.S. 599, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975) ("Tax Commission II").

2. The state succinctly refutes the preemption argument in its statement contained in its brief:

   > Before a balancing of state and federal interests is necessary, however, there must exist clear congressional intent to preempt the area and a direct conflict between the state and federal laws. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947), cautions that "we start with the assumption that the historic police powers of the states are not to be superseded by [federal legislation] unless that was the *clear and manifest* purpose of Congress." (Emphasis supplied.) Unless Congress's

   preemptive intent is abundantly clear, courts hesitate to invalidate state and local legislation for the added reason that "the state is powerless to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the burden." *Penn Dairies*, 318 U.S. at 275 [63 S.Ct. at 624]. A review of the federal law in the present case fails to reveal a congressional intent, either express or implied, to preempt the state's liquor regulations aimed at preventing "unlawful diversion" in contravention of the state's established liquor distribution system. Furthermore, as determined by the lower court, there is no direct conflict between the state and federal laws. Appellee's brief at 28.

Commerce Clause limitations when it restricts the importation of intoxicants destined for use, distribution, or consumption within its borders." *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 330, 84 S.Ct. 1293, 1297, 12 L.Ed.2d 350 (1964). There is nothing in the history of the amendment which states that the military shall be exempt from the effects of all types of state regulation in its procurement of liquor. In fact, such a position would be ridiculous in light of the myriad of state regulations applied to distillers and suppliers of liquor. Compliance with regulations regarding the importation of raw materials, general operations of the distillery or brewery, treatment of employees, bottling, and shipping necessarily increase the cost of liquor. The congressional mandate to purchase liquor for military personnel at the "most competitive" terms nonetheless impliedly accepts the presence of these expenses as unavoidable factors that increase the lowest available prices.[3]

The record suggests that significant expenses would be incurred if out-of-state liquor distributors comply with the North Dakota regulation. It is also reasonable to assume that the expense of compliance would be passed along to the federal government if it purchased liquor from these distributors. This increase in price, however, is neither the result of taxation nor an attempt to regulate liquor on a federal enclave. The regulation is solely intended to prevent diversion of out-of-state liquor destined for the military bases. As such, the state is within its power under the twenty-first amendment to enact this regulation. The federal government must accept the resulting increase in the cost of out-of-state liquor when it considers sources from which to purchase its liquor.

I therefore dissent.

3. This conclusion of the federal government's acceptance of these regulations is further bolstered with respect to state regulation prohibiting diversion by a Department of Defense directive which states that no member of the armed services shall divert "alcoholic beverages to unauthorized personnel, or for purposes which violate federal, state, or local laws * * *." DoD 1015.3–R, ch. 4, ¶ F3.